**John McRay MOLLISH**

v.

**Doris Ann MOLLISH.**

Court of Appeals of Tennessee,
Eastern Section.

Nov. 17, 1972.

Certiorari Denied by Supreme Court
April 16, 1973.

Rom Meares, Jr., Maryville, with Meares & Dungan, Maryville, for appellant.

D. K. Thomas, Maryville, for appellee.

## OPINION

SANDERS, Judge.

This is an appeal from a decree of the Circuit Court of Blount County where the Court granted a divorce to the husband and awarded him custody of their 22-month-old child because of the religious beliefs of the mother.

The Plaintiff, John McRay Mollish, and the Defendant, Doris Ann Mollish, were married in 1968. At the time of the trial of this case the Plaintiff was 30 years of age and the Defendant was 27 years of age and they had one daughter, 22 months of age.

At the time the parties were married the Plaintiff was a member of the Catholic faith and the Defendant was a member of the Lutheran Church. The Defendant was active in her church work, attended church every Sunday, taught a Sunday school class, acted as secretary, presumably, of the Sunday school, and had a children's nursery at the church. The difference in the religious faiths of the parties created no problem and when their child was born it was baptized in both the Lutheran Church and in the Catholic Church.

About eight months before the original bill in this case was filed, the Defendant became interested in the faith of Jehovah's Witnesses. After studying the teachings of this denomination for a while and attending some of their meetings, she renounced her affiliation with the Lutheran

Church and became a member of Jehovah's Witnesses.

Plaintiff objected to Defendant's attending meetings or being affiliated with Jehovah's Witnesses because he didn't believe in a lot of things they taught.

As time passed the Defendant apparently became more devout in her new-found religion and the objection of the Plaintiff to her affiliation with it became more severe.

The Plaintiff set out on a course of conduct to force the Defendant to give up her membership in the church. He would not permit any of the members of the organization to come to their home and, on occasions when they would come by to pick up the Defendant to take her to church meetings, they would have to wait for her at the highway.

The Plaintiff would burn or destroy all of Defendant's religious literature, including her Bible.

He would forbid the Defendant to attend church meetings and on one occasion when she wanted to attend he forceably restrained her. On another occasion when she told him she was going to a meeting he became enraged, turned over a table and a chair and physically whipped the Defendant.

At another time, after Plaintiff and Defendant had agreed that they would invite the priest of Plaintiff's church and the elders of Defendant's church to their home in an effort to resolve some of their differences, the priest did not attend, but the elders were there for a few minutes and after they left the Plaintiff asked the Defendant why she invited those people into his house, then departed and stayed away from home all night.

The following day, when the Defendant told the Plaintiff she was going to a meeting, he told her he would take her, but instead of taking her to the meeting he drove 16 miles out into the country. When he stopped, she got out of the car and he drove off and left her.

The Plaintiff would refuse to have sexual relations with the Defendant, in spite of her solicitous overtures. He would tell the Defendant that if they were going to live together she would have to get out of the church; that it was a choice between him and her religion.

He stopped talking to the Defendant and started staying away from home until late hours at night, claiming he had been fishing. But when she asked him about his fishing tackle, he would turn and walk away.

Because the Defendant refused to give up her religion, the Plaintiff filed suit for divorce and custody of their child, alleging cruel and inhuman treatment.

The Plaintiff alleged in his bill that their marriage was reasonably happy until about eight months prior to filing his bill, when the Defendant started "to toy with the idea of changing her church affiliation from that of a Lutheran to that of a Jehovah's Witness. This situation has grown progressively worse and has reached the point of being intolerable, all as will be more fully hereinafter set out."

He alleged that the Defendant would go to church meetings at least once a week and take their baby and stay until almost midnight. But on the trial of the case the proof showed that these meetings would last only about two hours and the Defendant would be home by 9:30 or ten o'clock.

The Plaintiff alleged in his bill that the Defendant went to the State of Louisiana, stating that she needed to get away for a while, but he learned that she had attended a convention of Jehovah's Witnesses while there. The proof showed that the Defendant went to Louisiana to visit her mother and sister and did attend a meeting while there, but did not make this trip for the purpose of attending such meeting.

The Plaintiff alleged that the Defendant was high tempered and on occasion had cursed him and told him that she didn't love him and that she hated him.

The Defendant denied that she had ever cursed the Plaintiff since she had embraced her new religion and the extent of the Plaintiff's testimony on this allegation was that on an occasion when he was forceably restraining her from leaving the home to attend a church meeting she had said, "Damn you." The Defendant admitted that on one occasion she told the Plaintiff she hated him, but this was after the Plaintiff had wrecked their car while drinking and, instead of purchasing another car for family use, he purchased a pick-up truck and she was so hurt and disappointed when he brought it home without having consulted her that she did make the remark.

The Plaintiff further alleged that when the Defendant returned from her trip to Louisiana she falsely accused him of having a woman in their home and suggested he had been in bed with this woman. The Defendant testified that upon her return from Louisiana she had a rather distressing telephone call which made her "think that, well, maybe John isn't fishing and everything"; that when she came back she found someone had been using her cosmetics, and bobby pins were on the sink, and long blond hair was in her hair brush; that although the Plaintiff had never before washed anything, the bed sheets had all been washed; that she did ask the Plaintiff if he had had someone in their home and "he said that he didn't have to tell me anything, that he didn't know when I was going to return. Then he said if Stanley Blair had one of his girl friends here at the house, he couldn't stop that."

The Defendant filed her answer to the Plaintiff's bill and later filed a cross bill seeking separate maintenance. The case was heard before The Honorable William Kittrell, Circuit Judge, who, after hearing the evidence, entered a judgment granting the Plaintiff a divorce and awarding him custody of their child.

The Defendant has perfected her appeal to this court and assigned error.

In rendering his judgment, the Court made no finding of fact, nor did he indicate upon what he relied for granting the Plaintiff a divorce and awarding him custody of the child. From reading the record, we can only conclude that the judgment was predicated upon the Defendant's religious beliefs.

On cross-examination the Plaintiff testified as follows:

"Q Mr. Mollish, it's my understanding that it's your impression that your and your wife's problems started about eight months before August when you filed for a divorce; is that right?

"A Well, I'd say it was probably about eight months.

"Q And that the whole source of your problems as you understood it was because of your wife's acquaintance and later affiliation with the Jehovah's Witness church; is that right?

"A Yes Sir."

Concerning the custody of the child, the Plaintiff, on direct examination, testified as follows:

"Q Mr. Mollish, as I understand you, if you are given a divorce in this case, it's your position that Mrs. Mollish is not a proper person to have custody of this child and rear it under the circumstances that she lives under?

"A Yes Sir.

"Q And strictly on account of her attachment to this church; is that right?"

"A Yes Sir."

In the course of the trial, the Plaintiff testified about certain beliefs of Jehovah's Witnesses which he does not embrace, but the one with which he appeared to be most

concerned so far as the welfare of their daughter is concerned, is that they do not believe in blood transfusions.

However, in this regard, the Defendant testified that it was her belief that the Plaintiff, as the natural father of their child, should have control of the child and if he should feel that the child needed a blood transfusion, she would permit it.

There are other divergences of religious beliefs of the Plaintiff and Defendant—but the reason there are so many different religions of the world and so many different denominations within the Christian religion is because of divergent beliefs.

The Defendant has premised her assignments of error on: (1) The Court's granting the Plaintiff a divorce and (2) The Court's awarding the custody of their infant child to the Plaintiff.

The Defendant insists that it was error for the Court to grant the Plaintiff a divorce because: (a) The proof did not support the allegations and (b) That since the divorce was grounded upon divergence of religious beliefs, the action of the Court was unconstitutional.

In construing the statutory ground of cruel and inhuman treatment for divorce, our Supreme Court, in the case of Baber v. Baber (1959) 205 Tenn. 681, 330 S.W.2d 307, said:

> "Cruel and inhuman treatment in this State is a wilful, persistent and continuing course of abusive and humiliating treatment of one spouse by another, as in the case of a course of conduct calculated to torture complaining spouse's mental or emotional state or bodily health."

We are unable to find any cases in Tennessee where our courts have had occasion to pass upon the question of divergence of religious views constituting cruel and inhuman treatment as the grounds for divorce. However, other jurisdictions have consistently held that, while acts growing out of religious beliefs or activities may create grounds for a divorce, the divergence of religious beliefs per se is not grounds for divorce.

The Constitution of the State of Tennessee, § 3 under the Declaration of Rights, provides:

> *"Freedom of worship.*—That all men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience; that no man can of right be compelled to attend, erect, or support any place of worship, or to maintain any minister against his consent; that no human authority can, in any case whatever, control or interfere with the rights of conscience; and that no preference shall ever be given, by law, to any religious establishment or mode of worship."

■ Although freedom of religion is a fundamental law of our land and is zealously protected by the Constitution of the United States and that of the State of Tennessee, as well as by the vast majority of decisions of our courts, a person is answerable for unlawful acts or acts harmful to others even though such acts conform to his religious beliefs.

In the case of Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244, the Supreme Court of the United States held that the practice of bigamy by the Mormons was unlawful even though it conformed to the Mormon faith and practices, and the Court said, "Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices." The Court further said, "To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances."

■ The general rule as to religious differences being a grounds for divorce seems to be well stated as follows:

"The law has not designated, and indeed could not make, diverse religious opinions a legal cause for separation. The fundamental law of the land guarantees freedom of religion and the right to worship according to the dictates of one's own conscience. But the manner in which one spouse practices his or her religious belief may constitute cruel treatment, entitling the other to a separation or divorce; the fact that conduct which is actually cruel is motivated by an excess of religious zeal does not excuse it on any theory of a constitutional guaranty of religious freedom."

Am.Jur.2d, Vol. 24 p. 215 § 46.

The courts, in addressing themselves to the question of divorce, where the divorce action is grounded upon divergence of religious beliefs, have consistently held that no relief can be granted. However, they have just as consistently held that conduct growing out of religious beliefs may constitute grounds for divorce.

A New York court held, in the case of Gluckstern v. Gluckstern, 148 N.Y.S.2d 391, 394:

"It is settled law that it is not ground for divorce or separation that the spouses entertain different views on religion . . . However, religious convictions may induce a spouse to do things that would ordinarily constitute a ground for separation; and in such a case the courts will be considered primarily with the acts themselves and not with the motive behind them."

In a Texas case of Haymond v. Haymond, 74 Tex. 414, 419, 12 S.W. 90, 92, the court said:

"It was defendant's right to have any religious belief, or none, as best suited her. If her conduct as a wife was such to furnish her husband grounds for divorce, the acts themselves would be the only proper subjects of investigation, without any regard to the religious connections that led to them."

In the case of Krauss v. Krauss, 163 La. 218, 111 So. 683, 685, the Louisiana court said:

"If the plaintiff's evidence went no further than to show religious differences that would end the case.

"The law has not designated and indeed could not make diverse religious opinions a legal cause of separation. The fundamental law of the land guarantees freedom of religion and the right to worship according to the dictates of one's own conscience.

"The defendant had the legal and moral right to pursue and to practice his own religious faith, and no court could deny such right or even criticize adversely the proper exercise of that right."

In the case of Hehman v. Hehman, 13 Misc.2d 318, 178 N.Y.S.2d 328, 330, the Supreme Court of New York said:

"No court, in the exercise of its judicial function, can or will assess any one creed against another. Each must be held to be *primus inter pares*. To take any other position would be in direct violation of the Constitutions of our nation and state."

And in the case of Thomas v. Thomas, 288 S.W.2d 689, 696, the Missouri Court of Appeals said:

"Under the Constitution of the United States any person has the right to worship as they please . . . The fact that the wife believes one way and the husband another way, insofar as religion is concerned, is no grounds for divorce . . . ."

■ In the case at bar there was no conduct on behalf of the Defendant, either related or unrelated to her religious beliefs, which could be said to be "a wilful, persistent and continuing course of abusive and humiliating treatment" of the Plaintiff. Baber v. Baber, *supra*.

■ Since the Court was without authority to grant a divorce based solely upon divergent religious beliefs of the parties, it was error for him to grant the Plaintiff a divorce.

The Defendant contends that it was error for the Court to award custody of the minor child to the Plaintiff in that: (1) The evidence shows the best interest of the child would be served by her remaining with her mother and (2) The Court was without Constitutional authority to award custody of the child based upon the Defendant's religious belief.

■ There is no dispute in this record but what both the Plaintiff and Defendant are persons of good reputation and character and are both fit persons to have custody of their child. Therefore, there is only one question to be determined. This is the paramount question in all custody cases: What is for the best interest of the child?

As said by our Supreme Court in the case of Holloway v. Bradley, 190 Tenn. 565, 571, 230 S.W.2d 1003, 1006:

"The determining facts in these adoption and custody cases are so infinite in their variety that the reported decision in one case is of little aid or assistance in settling the next. The supreme rule to which all others should yield is the welfare and best interest of the child."

In the case of Weaver v. Weaver, 37 Tenn.App. 195, 261 S.W.2d 145, the Court said:

"A mother, except in extraordinary circumstances, should be with her child

of tender years. The courts have repeatedly recognized this as a primary doctrine. 17 Am.Jur. 518; 41 L.R.A.,N. S., 575, Note, Newburger v. Newburger, 10 Tenn.App. 555.

"Normally, such a child will not be taken away from its mother unless it is demonstrated that to leave the child with its mother would jeopardize its welfare, both in a physical and in a moral sense. Supra."

■ We have searched the proof in the transcript of this record in an effort to find evidence to justify the action of the Trial Court in awarding the custody of this 22-month-old daughter to the Plaintiff instead of to the Defendant, and we have found none.

On the contrary, the proof demands that the custody of this child be awarded to the Defendant. The Plaintiff not only works regularly, but has no home or facility or close relatives to care for this child while he is away at work. A Mrs. Richard Vest, who lives in Lenoir City, testified that she had known both the Plaintiff and Defendant for several years and if the Court should award the custody of the child to the Plaintiff she would be willing to help look after the child for a while. She testified as follows:

"Q Mrs. Vest, Mr. Mollish tells the Court that if he were granted a divorce from his wife and custody of this baby that you would help with it?

"A Yes, he asked me if I would take care of the baby until he could get a permanent situation where he could have someone that would live in and take care of her.

"Q And are you willing to do that?

"A. And I said I would naturally take care of Jennifer.

"Q Do you have any children?

"A   I have three.

"Q   What are their ages?

"A   I have one 9, one 11, and one 4.

"Q   Do you feel you have the time and the ability and the room in your home and the other facilities to help him manage with that for awhile?

"A   Yes."

Although the willingness of Mrs. Vest to help care for the child is admirable and generous, she expressed no love or affection for the child and at least this arrangement is temporary until something more or less desirable can be worked out by the Plaintiff.

■   Just as the Court cannot grant a divorce because of divergence of religious beliefs, the religious beliefs of the parents cannot be controlling in custody cases.

Again, this question has not been before the courts of Tennessee, but an Arizona Court, in the case of Smith v. Smith, 90 Ariz. 190, 367 P.2d 230, 233 (the mother was a member of Jehovah's Witnesses), the court said:

".   .   .   it has been the uniform judgment of every court reaching the question that if a teaching does not conflict with the fundamental law of the land a parent may not be deprived of the custody of a child because of the court's disagreement with such parent as to religious beliefs."

In the case of Salvaggio v. Barnett, Tex.Civ.App., 248 S.W.2d 244, 247, in a case where the father was a member of Jehovah's Witnesses and was seeking custody of his child, the Texas Court of Civil Appeals said:

"Under the American principle of separation of Church and State, the secular power is so shackled and restrained by our fundamental law that it is beyond the power of a court, in awarding the custody of the child, to prefer, as tending to promote the interest of the child or surround it with a more normal atmosphere, the religious views or teachings of either parent."

The Missouri Court of Appeals, in the case of Brewer v. Cary, 148 Mo.App. 193, 127 S.W. 685, 692, said:

"Nor can we, in determining what is for the welfare of the infant, determine that on considerations of religion.   That would involve our determination between religions—and that we are not permitted to do."

In In Re Laura Doyle, 16 Mo.App. 159, 166:

"A great deal has been said in the argument as to the religious question.   In determining what will be best for the child, we cannot, under the system of law which we are appointed to administer, look at that.   The state of which we are citizens and officers, does not regard herself as having any competency in spiritual matters.   She looks with equal eye upon all forms of a so-called christianity, and subjects no one to any disability for rejecting christianity in any form, nor for rejecting the generally accepted doctrines of natural religion.   A father in Missouri forfeits no rights to the custody and control of his child by being, or becoming, an atheist, nor are his rights in this respect increased before the law by his believing rightly.   The law does not profess to know what is a right belief."

■   We think the Court was in error in awarding the custody of this child to the Plaintiff.

The Defendant's assignments of error are sustained.

The judgment of the Trial Court is reversed and the Plaintiff's suit for divorce is dismissed.

The Defendant's cross bill for separate maintenance is sustained. The Defendant is awarded custody of their minor child, with reasonable visitation privileges to the Plaintiff, and the order of the Trial Court fixing alimony at $50.00 per week is reinstated until modified by the Trial Court.

This case is remanded for the purpose of entering a decree in keeping with this opinion and fixing alimony and child support and providing reasonable visitation privileges for the father.

The cost of this appeal is taxed to the Appellee.

COOPER, P. J., and PARROTT, J., concur.