IN THE COURT OF APPEALS OF TENNESSEE
WESTERN SECTION AT JACKSON
_____

FILED

June 20, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

IN RE: NICKOLAS E. PRICE,
WILLIAM J. HARRIS,

    Appellant,

Vs.

Shelby Equity No. 103122-2 R D
C.A. No. 02A01-9609-CH-00228

CHRISTIAN CAROL PRICE,

    Appellee.

_____

FROM THE CHANCERY COURT OF SHELBY COUNTY
THE HONORABLE FLOYD PEETE, JR., CHANCELLOR

David E. Caywood, Amy R. Fulton;
Causey, Caywood, Taylor, McManus & Bailey of Memphis
For Appellant

*VACATED, RENDERED AND REMANDED*

Opinion filed:

**W. FRANK CRAWFORD,
PRESIDING JUDGE**

**CONCUR:**

**DAVID R. FARMER, JUDGE**

**WILLIAM H. INMAN, SENIOR JUDGE**

This is a child custody case. The petitioner, William J. Harris (Father), appeals from the order of the trial court awarding the parties joint custody of their minor child, with physical custody to Christian Carol Price (Mother).

Father and Mother were romantically involved from June 1986 to July 1988, but Father ended the relationship after he discovered Mother was involved with another man. After Mother promised to quit drinking and promised to see a psychologist, the parties reunited and dated from September 1988 to August 1989, but again Father ended the relationship because Mother continued to drink, stopped seeing the psychologist, and stopped attending church. However, Mother and Father met for dinner on October 12, 1992, Father's thirtieth birthday. The parties had sex that evening and conceived their son, Nickolas, who was born on July 22, 1993.

On July 27, 1993, Father filed a Petition for Legitimation and Custody in the Chancery Court of Shelby County. In the petition, Father states that he is the natural father of the child. Father avers that the parties were never married, that they do not plan to marry, and that the child was born out of wedlock. The petition alleges that Mother is currently engaged in a lifestyle that is not in the best interest of the child because she lives in an unhealthy, lesbian relationship that does not provide a supportive, stable home environment and will endanger the child's mental and emotional development. The petition also alleges that Mother has a history of instability including prior substance abuse and threatened suicide. The petition requests custody of the child and that the child be legitimated and given Father's surname.

On August 3, 1993, Mother filed an answer to the petition and a counter-petition. In her answer, Mother denies that she is engaged in a lifestyle that is not in the best interests of the child and denies that she cannot provide a supportive and stable home environment. Mother also denies that she has a history of instability. In her counter-petition, Mother alleges that the best interests of the child would be served by awarding custody to her. She requests custody and child support. In his response to the counter-petition, Father admits that he is able to provide child support, but denies that Mother is fit and proper to have custody of the child.

On June 21, 22, and 23, 1994 and March 27, 1995, the chancery court, sitting without a jury, held a hearing to determine custody of the child.

At the time of the hearing, Father was thirty-one years old. Father lives in Cordova, Tennessee in a two-bedroom apartment. Father testified that he graduated from Christian Brothers University with a bachelor of science degree in business administration. Father is employed by Data Documents as an account representative who takes care of inventory for customers, places orders, and seeks new business. Father works out of his home, and his salary

2

is $31,000.00 per year.  Father testified that he has a strong family support system in Memphis, including his parents and one of his brothers.  Father's brother is married and has four young children in Memphis.

Upon learning of Mother's pregnancy, Father testified that he told Mother that, although he could not marry her, he did not believe in abortion and could not give the child up for adoption.  Father told Mother that he was willing to do anything to help.  Father also wrote a letter to Mother, dated May 29, 1993, stating that he was willing to help in any way both before and after the child was born.  Father immediately decided to seek custody, but Mother's family did not tell her this until months later because she was pregnant and for fear of her reaction.  Father waited at the hospital for the delivery and saw the child within one hour of his birth.  Father placed the child on his health insurance that day.   Father exercised regular visitation and stated that Mother interfered with his visitation, although she has changed schedules on occasion to meet Father's needs.

Father testified that Mother has lived in many different places in Memphis and that Mother has been fired from jobs at Jack Chism, Continental Traffic, and Cardinal Machinery.  Father testified that Mother is not a truthful person.  He stated that she was dishonest in their relationship and that she lied to her grandparents.  She also used one of his credit cards without permission.

Father stated that Mother has a drinking problem and that she admitted to him that she needed some type of professional help.  Since the child was born, Father has smelled alcohol on Mother's breath when they were exchanging the child for visitation.  Father admitted that he drinks on occasion.  Father has also smelled cigarette smoke on the child's clothing.  He also stated that Mother told him that she attempted suicide twice and that she had threatened twice more to commit suicide.

Before the child was born, Father registered him with the Bartlett Day Care Center, a licensed child care provider, but Mother sent him elsewhere.  Mother told Father that she used a licensed child care provider, but when Father investigated, he learned that the child care provider was not licensed. Father was also worried because Mother took the child to a general practitioner instead of a pediatrician.  According to Father, the general practitioner did not know which shots or which vitamins to give the child.

Father admitted that Mother and the child have a very good relationship and that they are very close. He said that the child was happy to see Mother when they returned from visitation and that the child is a happy child. He testified that Mother is living in a lesbian relationship, but admitted that Mother is living in a good home and provides the child with all of his necessities.

Robin Rowe, one of Mother's old roommates and an ex-lover, testified that Mother's drinking habits caused minor problems in their relationship and that Mother was previously charged with driving under the influence (DUI). On one occasion, Rowe saw Mother drinking in a car in which the child was present. She was so concerned that she considered calling the Tennessee Department of Human Services. However, she did state that Mother does not regularly drink to excess and that the child is the most important thing in Mother's life.

William Carl Gammill, Mother's uncle, testified that he believed Father would be the more mature and stable custodial parent. However, he admitted that Mother and the child have a good relationship and that the child is happy and healthy. He stated that he saw no problems with what Mother has done with the child. Donna Gammill, Mother's aunt, testified that Father would make an excellent father for the child and that she would want Father to have custody over Mother if the child were her grandchild.

Father presented testimony that he was dependable, trustworthy, hardworking, and emotionally stable. After a number of witnesses, the trial court stated, "I'm not going to stop you from putting witnesses on, but I'm convinced Mr. Harris is a good father. The Court has no problem with that at all. I'm convinced that he has all the attributes of a good father. He has demonstrated that throughout, whatever that means to you."

Mother lives in Memphis, Tennessee in a three-bedroom house with Leslie Sears. Mother has moved twice since the child was born and moved fourteen times between 1989 and 1994. Mother testified that she also has a family support system in Memphis because her grandparents and her aunt live in Memphis. Mother stated that she attends church about once a month, but that it is hard to go with the child. Mother did not graduate from college and has a sporadic employment history.

At the time of the hearing, Mother worked for Park Furniture Company and had been employed there for three years. Prior to Park Furniture, Mother worked for Jack Chism. In her

deposition, she stated that her position with Chism was "phased out" because he needed someone with "a degree." However, in his deposition, Jack Chism stated that he "fired" Mother. At the hearing, she explained that she meant that he needed someone with more experience and admitted that she had been "let go," but denied that she had been fired. She was also let go from her job at Cardinal Machinery.

Mother denied that she has an alcohol problem and stated that Father purchased the alcohol for her before she was old enough to purchase it herself. She did say that her mother, the child's maternal grandmother, is a recovering alcoholic. Mother testified that she quit drinking and smoking while she was pregnant, but occasionally drinks and smokes now. Mother admitted that she was convicted of DUI and was arrested for public intoxication, reckless driving, and driving while her license was revoked, suspended, or canceled.[1]

Mother admitted that she has attempted suicide on two separate occasions, but denied that she was actually trying to kill herself. She said that she attempted suicide the first time to garner attention, and the second time, in 1991, she said she was depressed and did not like the way her life was going at that time. Mother left a suicide note the second time but, at the hearing, claimed it was not a suicide note because she did not remember making it. In the medical records of the second suicide attempt, the doctor filled out a form titled "Certificate of Need for Emergency Admission." The form, dated January 18, 1991, states, "In my professional opinion, based on my examination and the information provided me, I certify that this person 1. is mentally ill as shown by the following facts and reasoning: tried to kill herself & left suicide note, 2. poses an immediate substantial likelihood of serious harm because of the mental illness as shown by the following facts and reasoning: tried to kill herself." (emphasis in original). Mother was transferred to the Memphis Mental Health Institute for emergency care.

Mother is an admitted lesbian who lives with another lesbian, but they are not lovers. She testified that if she received custody, she would continue to live with her lesbian roommate.

Mother said that she sends the child to the chosen child care center because she feels it is the best one for the child. She uses the child care center because of a recommendation by a co-worker. After discovering during Father's deposition that the child care center was not

_____

[1] All of these charges, including the DUI conviction, stem from the same incident.

5

licensed, Mother was concerned and questioned the owner of the day care. However, Mother still takes the child to the unlicensed child care center.

Mother testified that when she told Father that she was pregnant, he said that abortion was an option. She stated that she wants Father to be a big part of the child's life, but that Father shows little emotion when she reports on the child's progress. Mother admitted that Father was a stable person emotionally and financially and that he was a good role model for the child, but said that he told her he might suffer from Chronic Fatigue Syndrome.

Mother's neighbors and friends testified that she is a loving and caring mother and that they would not be concerned if she was the custodial parent. Timothy A. McDonald, Mother's neighbor, testified that he saw Father threaten and yell at Mother. Dineen Price Hite, another of Mother's aunts, testified that, based on her contacts with Mother and Father, she supports Mother's bid for custody. Edna Price, Mother's grandmother, testified that she thought it would be in the child's best interests if custody were placed with Mother. However, she admitted that she felt mothers should always have custody over fathers.

Kelly Kemper, Mother's friend, testified that Mother changed her priorities after the child's birth and that the child is now her main focus. She said that everything about Mother has changed in the positive direction and that she has not seen Mother drink or smoke since the child was born.

Carol Hopper, another of Mother's friends, testified that Mother was happy and excited when she learned that she was pregnant. Hopper said that Mother always wanted to include Father in the child's life, and Hopper knew of no reasons why Mother should not have custody. During an objection to Hopper's testimony, the trial court interrupted and stated, "I don't have any difficulty with both of these parties. I think they are both loving and good parents. . . . I think Mr. Harris has been a loving and decent father. I think the mother has been a good, loving and decent mother."

Nell Estes, Mother's boss at Park Furniture, testified that Mother has a wonderful work ethic. She stated that she has no concerns about Mother's ability to care for the child and that she has seen Mother change from "a confused person to this mature beautiful person that she is now." Leslie Sears, Mother's roommate, testified that Mother has completely changed from the time she learned she was pregnant. She also stated that they no longer allow smoking in the

6

house.

Dr. John Robert Hutson, a clinical psychologist, examined Mother on three separate occasions, one of them with the child. He testified that Mother tested in the normal range and that there was nothing that concerned him about Mother having custody. He also stated that she was not currently at risk for suicide. However, he stated that there was "some risk probably genetically and also behaviorally in her past for alcohol abuse, but that did not seem to be an issue at the time of my evaluation and to the best of my understanding is not an issue today." Dr. Hutson said, "I was very confident that she would be a very competent parent. . . . I think it would be an outrage if she was denied custody of her son." Dr. Hutson did admit that he did not check sources other than Mother to verify her statements to him and that he did not know every fact about Mother's life.

Mother tendered Dr. Hutson as an expert in the area of parenting, including the subtopic of homosexual parents. He stated that there was no long-term harm to a child who has a homosexual parent. However, he acknowledged that it is a minor but noticeable experience that children raised by homosexual parents are subject to being ostracized and teased by their peers.

On February 6, 1996, the trial court entered an order on the petition finding that Father is the natural father of the child and that the child is the legitimate child of Father. The trial court ordered joint custody of the minor child and awarded physical custody to Mother. The trial court granted liberal visitation to Father and changed the child's name to Nickolas Evan Price Harris. Finally, the trial court denied Father's request for injunctive relief.

Father appeals the judgment of the trial court and presents three issues for review: 1) whether the trial court erred in failing to award Father sole custody; 2) whether the trial court erred in failing to place restrictions or enjoin Mother from cohabitating overnight with her lesbian lover and in failing to enjoin Mother from exposing the child to her relationship with members of the same sex; and 3) whether the trial court erred in refusing to admit certain opinions of Dr. John Hutson.

In his first issue, Father argues that he is the comparatively more fit parent. We believe that the real issue must be whether the evidence preponderates against the findings of the trial court. Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court.

7

Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d). This presumption applies in child custody cases. *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984).

In child custody cases, the welfare and best interest of the child is the paramount concern, and the determination of the child's best interest must turn on the particular facts of each case. *Holloway v. Bradley,* 190 Tenn. 565, 230 S.W.2d 1003 (1950). In *Holloway*, the Court said:

> The determining facts in these adoption and custody cases are so infinite in their variety that the reported decision in one case is of little aid or assistance in settling the next. The supreme rule to which all others should yield is the welfare and best interest of the child.

*Id.* at 571, 230 S.W.2d at 1006.

In *Bah v. Bah*, 668 S.W.2d 663 (Tenn. App. 1983), this Court adopted a "comparative fitness" test to determine custody:

> We adopt what we believe is a common sense approach to custody, one which we will call the doctrine of "comparative fitness." The paramount concern in child custody cases is the welfare and best interest of the child. *Mollish v. Mollish,* 494 S.W.2d 145, 151 (Tenn. App. 1972). There are literally thousands of things that must be taken into consideration in the lives of young children, *Smith v. Smith*, 188 Tenn. 430, 437, 220 S.W.2d 627, 630 (1949), and these factors must be reviewed on a comparative approach:
>> Fitness for custodial responsibilities is *largely a comparative matter.* No human being is deemed perfect, hence no human can be deemed a perfectly fit custodian. Necessarily, therefore, the courts must determine which of two or more available custodians is more or less fit than others.
> *Edwards v. Edwards*, 501 S.W.2d 283, 290-91 (Tenn. App. 1973) (emphasis supplied.)

*Id.* at 666.

In *Bah*, this Court established some guidelines for making the determination of best interest:

> To arrive at the point of deciding with whom to place a child in preparation for a caring and productive adult life requires consideration of many relevant factors, including but certainly not limited to the age, habits, mental and emotional make-up of the child and those parties competing for custody; the education and experience of those seeking to raise the child; their character and propensities as evidenced by their past conduct; the financial and physical circumstances available in the home of each party seeking custody and the special requirements of the child; the availability and extent of third-party support; the associations and influences to which the child is most likely to be exposed in the

8

> alternatives afforded, both positive and negative; and where is the greater likelihood of an environment for the child of love, warmth, stability, support, consistency, care and concern, and physical and spiritual nurture.

*Id.*

In this case, Father argues that every conceivable factor to consider dictates in his favor. Father argues that Mother did not offer any testimony whatsoever that she is more emotionally or financially stable than Father or any substantive proof that she is a more fit custodial parent other than the fact that she is the child's mother. Although the trial court found that both parents were "loving" and "decent" parents, we believe that Father is the comparatively more fit parent and that the evidence preponderates against the findings of the trial court.

We believe that Mother has shown a history of emotional instability as evidenced by her past suicide attempts. The evidence shows that her family background is rocky and that Father has a better family support system in Memphis. Mother's family was afraid to tell Mother that Father was planning to seek custody because of the way she might react. In addition, Robin Rowe was so concerned about Mother's drinking that she considered calling the Tennessee Department of Human Services. Mother admitted that she was convicted of DUI thirteen months before the child was born. DUI is a serious offense that shows a lack of judgment on Mother's part. Finally, the evidence showed that Mother moved fourteen times since 1989 and twice since the child was born in 1993. This could be conducive to an unstable home environment for the child.

Father also argues that the associations and influences to which the child would be exposed at Mother's home are detrimental to the child's emotional and moral welfare. The lifestyle of each parent is definitely a factor for this Court to consider, and we must consider a parent's conduct to the extent the interest of the child is concerned. *In re Parsons*, 914 S.W.2d 889, 894 (Tenn. App. 1995).

Mother testified that she intended to continue sharing a home with her lesbian roommate and that she would continue to have her lesbian friends visit in the home. We make no moral judgments concerning Mother's lifestyle as it applies to her and to her friends. However, we cannot disregard a parent's activity that may have an impact in the developmental stage of a child's life. We feel it is unacceptable to subject children to any course of conduct that might

9

signify approval of any illicit conduct whether it be between homosexuals or heterosexuals. Mother and her roommate have testified that they are not lovers, and there is nothing in the record to indicate that this is not correct. However, Mother's prior history of emotional stability as compared to Father's history appears to fall measurably short.

Father has shown great concern for the child. He immediately placed the child on his health care plan and petitioned for custody within five days of the birth. Father showed concern about the unlicensed day care center and the general practitioner used by Mother.

We should also point out that after Father filed his brief and no brief was forthcoming from Mother, Father's attorneys filed a motion on January 27, 1997 to have the appeal submitted on the record, Father's brief, and Father's oral argument. This motion and the affidavit of Father's counsel were served on Mother. On February 6, 1997, this Court entered an order that Mother show cause within ten days why this appeal should not be considered as requested by Father. Mother did not respond to this order. In an effort to be sure that Mother was advised of the pending action, the Court again entered an order on February 25, 1997 for Mother to show cause on or before March 7, 1997, why the appeal should not be considered as requested by Father. Mother made no response to this order.

While Mother's lack of attention to this Court's orders is in the nature of a post-judgment fact, it does cause this Court grave concern. The trial court made a determination that the best interest of the child required that Mother have physical custody, and Mother's lack of participation in this appeal without any explanation could indicate a lack of concern in promoting what the trial court felt was the best interest of the child. Considering the record in its entirety, it appears that Father is in a better position to provide and can provide a more consistent and stable environment for the child. We find that the evidence preponderates against the findings of the trial court in this regard.

In his second issue, Father argues that the trial court should have enjoined each party from cohabitating overnight with individuals with whom either party is romantically involved while the child is in his or her care. The trial court did not place any restrictions on either party in its order. We agree with Father that restrictions should be placed on both parties. Each party should be prohibited from residing overnight with an individual with whom he or she is romantically involved when the minor child is present, and each party should be prohibited from

engaging in sexual conduct in the child's presence.

Because of the Court's holding in this matter, Father's third issue is pretermitted. The judgment of the trial court awarding physical custody to Mother and setting visitation rights for Father is vacated, and Father is awarded physical custody. The judgment is otherwise affirmed subject to modification as directed herein. The case is remanded to the trial court to establish liberal visitation rights for Mother and to determine her obligation for child support. The trial court shall also modify the judgment to place restrictions on the parties' conduct in the child's presence as indicated in this opinion. Costs of the appeal are assessed against Mother.

_____
**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

**CONCUR:**


_____
**DAVID R. FARMER, JUDGE**


_____
**WILLIAM H. INMAN, SENIOR JUDGE**