# IN THE COURT OF APPEALS OF TENNESSEE,
## AT NASHVILLE

_____

|  |  |  |
|---|---|---|
| **AMY L. JOHNSON**, | ) | Sumner County Chancery Court |
| | ) | No. 95D-40 |
| Plaintiff/Appellee. | ) | |
| | ) | |
| VS. | ) | C.A. No. 01A01-9708-CH-00410 |
| | ) | |
| **HAROLD G. JOHNSON**, | ) | |
| | ) | |
| Defendant/Appellant. | ) | |
| | ) | |

**FILED**

**September 30, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

From the Chancery Court of Sumner County at Gallatin.
**Honorable Tom E. Gray, Chancellor**

**Curtis M. Lincoln**, Hendersonville, Tennessee
Attorney for Defendant/Appellant.

**Robert G. Ingrum**, PHILLIPS & INGRUM, Gallatin, Tennessee
Attorney for Plaintiff/Appellee.

OPINION FILED:

**AFFIRMED AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**LILLARD, J.**: (Concurs)

This is a divorce case. Harold G. Johnson (Husband) and Amy L. Johnson (Wife) were married on October 22, 1988 when he was 47 and she was 20 years old.[1] During the marriage, the parties adopted a son, Justin, born January 11, 1991. In April 1997, the trial court entered a final decree declaring the parties divorced pursuant to T.C.A. § 36-4-129. Husband has appealed from the final decree, challenging the correctness of the trial court's decisions regarding child custody, alimony and classification and division of the marital estate. For the reasons hereinafter expressed, we affirm.

The record reflects that this marriage of approximately nine years was rather tumultuous from the outset with the parties separating at least twice, one time for almost a year, before finally separating in January 1995. Wife admitted to two extra-marital affairs during the marriage. Wife has a G.E.D. degree and is a licensed cosmetologist. She currently works on a part-time basis (two days per week, earning $150) and also attends college part-time taking certain prerequisite courses so that she can be accepted into a two year nursing program. In July 1989, Wife was diagnosed with ovarian cancer for which she underwent surgery and chemotherapy. She is currently in remission. Wife has also been diagnosed with "nonspecific autoimmune condition," described by her treating physician, Dr. Walker, as "one of the chronic fatigue type syndromes." Husband is self-employed and during the marriage operated Johnson Machine and Tool, until its sale in 1993. A new business, Pilot Machine, was begun in 1994.

The parties took custody of Justin shortly after his birth, but finalization of the adoption was delayed until 1993 due to their marital difficulties. The parties were required to undergo counseling after their separation in December 1991 and an order of reconciliation was entered in December 1992. It is not disputed that Wife has been the primary caretaker of the child.

The marital residence was purchased on October 6, 1988 for $156,500. Husband used $106,000 of his separate funds as a down payment and the parties obtained a loan for the remaining amount. The deed was recorded November 7, 1988 in Husband's name only. Other realty purchased during the marriage includes approximately 7.73 acres located adjacent to the marital residence, a

---

[1]This marriage was the second for both parties. Husband's first divorce was final in March 1988 and Wife's divorce from her first husband was final in August 1988.

condominium, and an additional 63 acres. Only the latter was titled in both parties' names.

The trial court entered a final decree of divorce awarding sole custody of Justin to Wife with specified visitation to Husband. Husband was ordered to pay $842.10 per month as child support, to maintain health insurance on the child and pay one-half of his health expenses not covered by insurance. The court determined the separate property of both parties with Husband receiving a retirement account in the amount of approximately $17,000, all monies realized from the sale of Johnson Machine and Tool, approximately $99,000 in a pre-marital bank account, $9,800 in automobiles, certain royalties from Husband's business and various other items of personalty. Wife received her separate property consisting of personal clothing, items of jewelry and "personal memorabilia." The court awarded marital property to Husband consisting of a 1993 pick-up truck valued at $22,000, an Oldsmobile valued at $2,000, a Ford tractor valued at $2,200, an IRA in the original amount of $2,000 invested by Husband in 1994 plus interest to date, horses and tack valued at approximately $13,000 and all realty of the parties, valued by the trial court at $405,000.[2] Husband was also awarded household furnishings totaling approximately $16,000. Wife received household furnishings totaling approximately $11,000, a Blazer valued at $9,500, $3,000 from the sale of tack and $19,000 representing funds that she previously removed from the parties' joint bank account after the separation. Wife's division of assets also included a cash award of $172,000, secured by liens placed on all the real property. Wife was awarded rehabilitative alimony in the amount of $698 per month for a six month period or until her remarriage, with the court expressly reserving the right to review the matter at the end of the period.[3] Wife was also awarded $16,830 in attorney's fees.

Husband presents the following issues on appeal:

> I. The trial court erred in granting custody of the minor child to the wife.

---

[2]Of this figure, $200,000 represented the fair market value of the marital residence as found by the trial court. The court reduced this figure by $106,000, representing the separate funds utilized by Husband in its purchase, to arrive at a net of $94,000 which represented marital property.

[3]The record reflects that the court believed this necessary in order to extend the award if she had not received "her cash" in the division of marital assets.

II. The trial court erred in dividing the marital assets; erred in failing to determine that Wife had seriously depleted the marital estate while Husband had increased it and erred in failing to determine that much of what the court found to be marital assets, was actually purchased by Husband's separate property, therefore, making it separate property.

III. The trial court erred in awarding Wife her attorney fees.

IV. The trial court erred in granting rehabilitative alimony to the wife.

Our standard of review in this matter is pursuant to Rule 13(d) T.R.A.P. which provides for a ***de novo*** review accompanied by a presumption of correctness of the trial court's findings of fact, unless a preponderance of the evidence is otherwise. ***E.g., Whitaker v. Whitaker***, 957 S.W.2d 834, 838 (Tenn. App. 1997). The first issue we address is that of child custody. The court in ***Whitaker*** addressed the various factors established by both case law and statute which assist the courts in making decisions of child custody:

> In child custody and visitation cases, the welfare and best interests of a child are the paramount considerations and the rights, desires, and interests of the parents become secondary. ***Neely v. Neely***, 737 S.W.2d 539, 542 (Tenn.App.1987). In ***Bah v. Bah***, 668 S.W.2d 663 (Tenn.App.1983), the Court established some guidelines for making the determination of best interest:
>
> > We adopt what we believe is a common sense approach to custody, one which we will call the doctrine of "comparative fitness." The paramount concern in child custody cases is the welfare and best interest of the child. ***Mollish v. Mollish***, 494 S.W.2d 145, 151 (Tenn.App.1972). There are literally thousands of things that must be taken into consideration in the lives of young children, ***Smith v. Smith***, 188 Tenn. 430, 437, 220 S.W.2d 627, 630 (1949), and these factors must be reviewed on a comparative approach:
> >
> > > Fitness for custodial responsibilities is largely a comparative matter. No human being is deemed perfect, hence no human can be deemed a perfectly fit custodian. Necessarily, therefore, the courts must determine which of two or more available custodians is more or less fit than others.
> >
> > ***Edwards v. Edwards***, 501 S.W.2d 283, 290-91 (Tenn.App.1973) (emphasis supplied).
>
> ***Bah***, 668 S.W.2d at 666.

The trial court must also consider the factors as set forth in T.C.A. § 36-6-106 (1996):

**36-6-106. Child custody. --** In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, such determination shall be made upon the basis of the best interest of the child. The court shall consider all relevant factors including the following where applicable:

(1) The love, affection and emotional ties existing between the parents and child;

(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; and

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child.

*Whitaker*, 957 S.W.2d at 837-38.

With the foregoing in mind, we consider the following proof that was before the trial court on this issue. As heretofore noted, Wife is in remission from ovarian cancer and suffers from an autoimmune condition symptomized by, *inter alia*, sleep disturbance, colitis, persistent low grade fever, night sweats and chronic fatigue. Dr. Walker described Wife's condition as:

> Probably a chronic reaction of your body in a situation very similar to arthritis. . . . it's a chronic inflammatory disease. It is a disease that is readily improved with some of the anti-inflammatory medicines, but it is not a disease which is completely treatable. The symptoms can be improved with some medicines, and that's basically what I've been doing over the last several months when I've been treating Ms. Johnson.

Walker did not believe Wife's condition to be "totally debilitating," but maintained that it was complicated by her past medical problems as well as silicone breast implantations which she received in 1986 and were subsequently removed in 1994. Walker described Wife's present condition as "stable at the condition she is in now. I think she is well controlled with medication." Walker has also treated Wife for depression. When asked whether Wife's physical condition would disqualify her from taking care of a young child, Walker responded, "[a]s far as specific medical conditions, like am I suspicious that she might blackout, am I suspicious that she's going to have a heart attack, am I worried about her not having good thinking skills? No, sir." Walker agreed that Wife's predisposition to fatigue and malaise would naturally be enhanced by caring for a small child, stating: "[i]f you are predisposed to fatigue and malaise, then anything that causes fatigue and malaise would accentuate it. Sure." Wife testified that "sometimes" her illness has prevented her from participating in certain activities and that she continues to receive treatment from Dr. Walker whenever she has "a flare up."

Wife testified that for the first year of Justin's life she did not work outside the home. Within the next two years, Justin spent a couple of days a week at "Kiddy Kampus" because Wife believed it important that "he learn to share and be around other children . . . ." Wife stated that Husband agreed that such activity benefited their son. During the second year of Justin's life, Wife and Husband were separated. The separation was precipitated by a December 1991 incident which, as related by Wife, occurred upon her arrival home, whereby Husband "tied me up, tied my hands behind my back, drug me back to the bedroom . . . and threw me down and choked me. I thought he was going to kill me." Justin was in the home in his crib at the time. Wife ultimately ran out of the home to a neighbor's house for assistance. Husband did not contradict Wife's testimony in this regard, but merely stated that he had "handled that wrong" and "was wrong." He explained that he "had seen [Wife] slash her wrist when she was not drunk. She was drunk on this occasion." He continued, "partly for her protection and for Justin's protection, I admitted I was wrong . . .

Afterwards in counseling I said I want to make sure this never happens again, and it didn't ever happen again and never will. I apologized for it, and I did my very best to make restitution in every way I could."

Husband stated that during this period of time, both he and Wife were doing drugs. Wife admitted to being a social drinker and that she had experimented with cocaine and marijuana on one occasion. Husband disputed this, testifying that both parties used alcohol, marijuana and cocaine on a regular basis in 1991. He stated that he ceased using these drugs in 1992 when the parties reconciled after nearly a one year separation.

Wife also related an incident regarding a May 1996 birthday party for her nephew. Wife's sister had prepared a birthday party for her son at Moss-Wright Park. It was to be a western theme, with ponies for the children to ride. Justin had received an invitation to the party in the mail and, according to Wife, was very excited and wanted to attend. As it happened, the date for the party fell on a weekend when Husband was to have visitation. It was agreed, however, that Justin could attend the party and that Husband would bring him and pick him up afterwards. Numerous relatives of Wife's attended the party, including her great-grandmother, parents and their respective spouses as well as her siblings and their children. Wife arrived at the party in a car belonging to her boyfriend, Mike Williams. Williams did not attend the party. Thereafter, Justin arrived with Husband who became very upset upon seeing Williams' vehicle. Husband continued to drive, circling around the area where the party was being held but would not let Justin exit the vehicle or attend the party. According to Wife, Justin was upset and crying. Husband then exited the park with Justin in tow and traveled to Williams' home. A heated exchange between Williams and Husband followed with Williams ultimately hitting Husband. Justin remained in Husband's vehicle and observed the entire incident. Husband does not deny that he then asked Justin to take a picture of him with blood on his face and stating to him that "this may help us." The police and an ambulance were called to the scene. Wife also arrived. The parties dispute whether Husband allowed Wife to comfort the child who, admittedly, was in tears and upset.

Husband explained that upon his arrival to the park and observing Williams' vehicle, he became upset because Williams and Wife had previously "flaunt[ed] their loving and carrying on

in front of me and Justin." He admitted that he did not know for sure whether Williams was at the party. He denied that Justin began to cry because he could not attend the party. He stated that he simply informed the child that they would instead go to the saddle club. According to Husband, one of Justin's favorite activities is participating in equestrian events. Instead of going straight there, however, they went to Williams' home. Husband attempted to explain his actions by stating, "[i]t was probably another one of those mistakes I'm capable of making, which is to let frustration get ahold of me once in a while, and plus her flaunting . . . ." Husband stated that he became further upset upon seeing the parties' vehicle at Williams' residence. He stated, "I just didn't like the idea of it sitting there. Justin didn't like the idea of it sitting there." Husband said that Justin cried because Williams had gotten in Husband's truck and thrown several items, including cameras, outside. Husband said that after the altercation, he explained to the child that everything was alright and that he was not hurt. He maintained that "[Justin] was happy at that point. He was satisfied that [my injuries] didn't hurt. . . . He was satisfied that I was okay. And not only did he stop crying, but he was okay. . . ." Husband also acknowledged that later that evening he drove to Wife's residence with Justin and placed a bandage on her door that read "thanks."

Wife testified that on the following day Husband arrived at her apartment with Justin to bring him back from visitation and ran into the back of Williams' vehicle. According to Wife, Justin was present in the truck with Husband when the accident occurred. Husband denied ever hitting Williams' vehicle, but the parties agree that the police were called to the scene. Husband admitted calling the police on several occasions when he suspected that either there was something wrong inside Wife's apartment or that she had been drinking. He further admitted calling the police on at least four separate occasions complaining of problems in Wife's home because there had been "unrelated males in the house." Husband explained that he believed his actions "helps keep [Wife] straight." He was asked how he knew unrelated males had been present in the home and answered, "[w]ell, you go over there and you park, and you see, for example, Bobby Rankin's truck there or you see [Williams'] truck . . . ." Husband said that Justin had "cried to sleep between [Wife's] boyfriends."

The parties also described the other's behavior at various football games in which Justin participated. Wife stated that Husband always came to the games with a video camera and

"used it as a means of harassment." Husband admitted carrying a video camera to the football games, stating that it was for his own protection and that he videoed Wife and Williams acting inappropriately towards one another, flaunting their sexuality and taunting him in this regard.

Husband maintains that he has been a positive influence on the child. When asked why he is better fit to have custody of Justin, Husband declared: "[t]here is a big difference in the lifestyles that they lead over there and the lifestyle that Justin leads at home. At home Justin goes to church. I read to him. We work on math. . . . He feels free, and he feels happy. . . . And Justin is a very special kid, and he's also a very intelligent kid. And in this two years, I have not dated and I have not drank. I have stayed at home with my horses, my guitar, and I just wait and live for the moments he gets back there." Husband stated that he would pay for Justin's private school tuition if he could attend the school Husband had chosen, Day Spring Academy. As for the private school Wife had chosen which was nearer to her home, Husband stated that he was unsure about paying for his child's attendance there, stating that he would have to review its curriculum and tuition costs, but would consider the school.

Tim Lynch, a clinical psychologist, testified that he treated Husband once in August 1995 and once again in July 1996. He did not foresee any problems with Husband parenting his child but indicated that Husband had a tendency to be somewhat overprotective of his son. Lynch believed this problem could be resolved with additional counseling.

Husband argues on appeal that he is comparatively more fit to have custody of Justin because he is older, more settled, has already participated in the raising of two children and spends whatever time he has available with Justin. He contends that the proof establishes that Wife on the other hand is at an age in life where her own well being and happiness take precedence. Husband asserts that Justin "*is* [his] life." Wife counters that Husband's reasons for seeking custody are not necessarily directed at Justin's best interests, but rather to fulfill his own needs which include hurting Wife.

After careful review of the record before us, we are in agreement with the trial court that Wife is the more fit custodian for Justin. We do not doubt either party's love for their child.

The record clearly convinces us, however, that Husband has succeeded in involving Justin in the parties' marital difficulties. In *Varley v. Varley*, 934 S.W.2d 659 (Tenn. App. 1996), this court said:

> It goes without saying that in many, if not most, cases of divorce, one may expect a certain amount of animosity between the divorcing parties. . . . However, when children are involved, it is imperative that the parents set aside their hostilities where the children are concerned, for the sake of the children.

*Varley*, 934 S.W.2d at 668. In the present case, the trial court expressly found neither party credible. However, certain incidents were related to the trial court where the parties are in agreement. The first incident pertained to Husband's tying Wife up as she arrived home one evening when Justin was in the home. We also have the birthday party incident where there can be no question but that Husband clearly put his anger and hostilities toward Wife above the best interests and needs of his young son. The birthday party was a time for celebration and from all indication it was an event that Justin was looking forward to attending. Instead, he was brought to the party and allowed to observe the activities but not allowed to attend. Instead of riding ponies and playing with his friends, Justin was privy to an altercation between his father and Wife's boyfriend resulting in his father receiving a bloody face which he was asked to photograph. Clearly, Husband's actions and negative behavior directed toward Wife have indirectly affected Justin and cannot be in the child's best interests. We can find no excuse for a parent to allow his/her child to become embroiled in the divorce "battles" of the parents. From the record, it appears that Justin has witnessed numerous confrontations between his parents regarding this divorce and that most all have come about by the actions of Husband who has not seen fit to address his hostilities toward Wife outside the presence of his child. The record does not indicate similar actions on Wife's behalf. It also disturbs this court that Husband has expressed no remorse in allowing his child to observe these unfortunate events or any concern as to what effect they may have on Justin in the future.

The record indicates that Wife has primarily cared for Justin during his life. Although Wife endures a chronic illness, the record does not suggest that she is physically incapable of caring for the child, nor do we find Wife's present work/school schedule to interfere with Justin's care.[4]

---

[4]Two of Wife's classes are video courses taken at home and the other two, which require her actual attendance in class, comprise approximately five hours of her time per week.

Justin presently attends kindergarten and Wife testified that day care is available. There is also undisputed evidence in the record that Wife's extended family members are close and that Justin has many playmates within the family. This is not to say that all of Wife's behavior is to be commended. There has been drug use and numerous boyfriends. The record, however, does not suggest that Wife, despite these actions, has neglected her son. In ruling from the bench, the trial court expressed some concern over the fact that Wife had allowed her boyfriend(s) to discipline the child, but noted that none had ever physically struck him. The trial court warned that Wife was to discipline and control the child, not any boyfriend. We reiterate here that Husband and Wife should be in charge of disciplining their own son and we encourage Wife to refrain from allowing such action by any boyfriend in the future. We conclude that custody of Justin was properly awarded to Wife.

We next consider the issue regarding the trial court's classification and division of the marital property. The trial court is afforded wide discretion in dividing the marital estate upon divorce. T.C.A. § 36-4-121(c) requires an equitable distribution of the marital assets, according to the factors identified therein. **Loyd v. Loyd**, 860 S.W.2d 409, 411-12 (Tenn. App. 1993). According to Husband, the trial court valued the total marital estate at $381,500 and his separate estate at approximately $115,000 for a total of approximately $496,000 which he asserts is less than the total value of his premarital estate. Husband argues that because his net worth fell during the course of the marriage, it was improper for the court to award Wife over half of what the court found to be marital assets. He further asserts that Wife in no way contributed or acted to preserve the four pieces of realty and argues therefore that these properties should have been classified as part of Husband's separate estate.

The record indicates that the trial court valued the entire marital estate at approximately $400,000.[5] Of this amount, Wife received approximately $42,000 and Husband approximately $367,000. Wife, however, was awarded an additional $172,000 in cash, reducing Husband's award to approximately $195,000.

The bulk of the marital estate is the real property. The trial court found all four of

---

[5]This amount includes household furnishings which were valued according to Wife's Exhibit 6 in the trial. The trial court placed no value on these particular items.

these properties marital despite the fact that only one is titled to both parties jointly and Husband's claim that his separate assets were used to purchase each of the properties. The record reflects that all properties were purchased during the marriage, with the exception of the marital residence which was purchased 16 days prior. The 63 acres was purchased for approximately $90,000 in May 1991. The approximately 8 acres was purchased in February 1990 for $17,500. Finally, the condominium was purchased in August 1993 for $42,000, according to Husband.

In arriving at Husband's pre-marital estate, the trial court found that Husband came into this marriage with approximately $100,000 in cash. The court expressly stated that he took this amount "into consideration in looking at the division of the marital estate." As Wife points out, $106,000 of Husband's separate funds was used as a down payment on the marital residence which would account for most of Husband's pre-marital cash assets. Husband also came into the marriage with Johnson Machine and Tool which the trial court in his first divorce case valued at $243,000. Husband testified that he sold Johnson Machine and Tool for $400,000 on December 2, 1993. Thus, all four properties were purchased prior to the sale of this business. Husband also testified that he paid cash for all the realty, with the exception of the $50,000 note on the marital home.

We cannot agree with Husband's argument that all of the realty was purchased with his separate assets with the intent that they remain separate. None of the assets used to purchase these four properties (with the exception of the $106,000 paid toward the purchase of the marital residence) are clearly traceable to his premarital assets. The properties' total purchase prices far exceed the amount of his pre-marital cash assets and the business from which he received the majority of his income was not sold until after all four of the purchases. The record indicates that Wife contributed monetarily to the marriage, although her employment throughout was never more than part-time. The record further indicates that the parties maintained a joint bank account. We therefore are not persuaded that the properties were purchased solely with separate funds with the intent that they remain a part of Husband's separate estate.

This court is unclear how Husband arrives at a figure of approximately $500,000 as representing the parties' total separate and marital estate. Nor is it clear to this court how he can arrive at a loss in his pre-marital net worth. He maintains that he came into the marriage with an

estate of $527,980 plus $123,789.60, if including the amount of royalties which the court determined to be his separate property but acquired during the marriage, for a total of $651,769.60. The record before us does not support Husband's calculations. Husband came into this marriage with $116,180.90 representing a cash disbursement from his prior divorce proceeding (this figure includes approximately $17,000 from a retirement account), $123,789.60 from royalties, $243,000 representing the value of Johnson Machine and Tool as determined in the prior divorce hearing, plus approximately $10,000 in automobiles for a total pre-marital estate of approximately $490,000. The present litigation resulted in Husband receiving, as his separate property, assets totaling approximately $650,000.[6] We conclude that no error was committed by the trial court in its classification and division of marital property.

We discuss Husband's final two issues together. He has argued that the trial court erred in awarding Wife rehabilitative alimony plus a portion of her attorney's fees. The trial court has broad discretion in making these awards. *Loyd*, 860 S.W.2d at 412-13. The decision is based upon the particular facts of the case and requires a balancing of the factors listed in T.C.A. § 36-5-101(d). Need and the ability to pay are the most critical factors. *Id*. at 412. Husband asserts that no alimony should be awarded because he paid Wife a total of $17,300 in alimony during the pendency of the trial, which was delayed twice at Wife's request. As to the award of attorney's fees, Husband contends that Wife received sufficient funds from the divorce with which to pay these fees. The trial court awarded Wife rehabilitative alimony in the amount of $698 per month for a six month period or until her remarriage. The record indicates that Wife presently works part-time earning approximately $150 per week. She also attends college on a part-time basis. The record further reflects that Wife suffers from an autoimmune condition which causes chronic fatigue and other symptoms for which she requires medication. Dr. Walker testified that it would be difficult for Wife to maintain a 40 hour per week job due to her medical condition. Although Husband's annual income tax returns for the years 1988-96 indicate a gross annual income of approximately $30,000 (with the exception of 1993 which return reflects an income of approximately $250,000 due to the sale of Husband's business), Husband's own testimony and the amount of marital assets distributed suggests a different annual income. We find that Husband is capable of paying the amount of

---

[6]This figure includes the gross amount of proceeds from the sale of Johnson Machine and Tool and does not take into consideration the tax consequences of the sale.

rehabilitative alimony awarded and that the record supports Wife's need for such an award.  We further find no error in the award of attorney's fees.  However, we deny Wife's request for any award of her attorney's fees incurred in this appeal.

The judgment of the trial court is hereby affirmed and this cause remanded thereto for any further proceedings necessary and consistent with this opinion.  Costs are assessed against Husband, for which execution may issue if necessary.

_____
FARMER, J.


_____
CRAWFORD, P.J., W.S. (Concurs)


_____
LILLARD, J. (Concurs)