# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

GREGORY C. LURIE       )
                               )

      Petitioner/Appellant,     )          Appeal No.
                               )         01A01-9807-CV-00376

v.                           )
                               )         Sumner County Circuit

MICHELLE H. (LURIE)    )         No. 11754-C
MANNING               )
                               )

      Respondent/Appellee.     )
                               )

COURT OF APPEALS OF TENNESSEE

APPEAL FROM THE CIRCUIT COURT
FOR SUMNER COUNTY

**FILED**

September 21, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

THE HONORABLE TOM E. GRAY,
SITTING BY INTERCHANGE, PRESIDING


LAURA Y. GOODALL
113 WEST MAIN STREET
GALLATIN, TENNESSEE 37066

ROBERT TODD JACKSON
222 SECOND AVENUE NORTH
SUITE 419
NASHVILLE, TENNESSEE 37201

ATTORNEYS FOR PETITIONER/APPELLANT

MARK T. SMITH
KELLY & SMITH
121 PUBLIC SQUARE
GALLATIN, TENNESSEE 37066

ATTORNEY FOR RESPONDENT/APPELLEE

**AFFIRMED AND REMANDED**

                       PATRICIA J. COTTRELL, JUDGE

CONCUR:
CANTRELL, J.
KOCH, J.

# OPINION

This appeal involves the custody of two minor children. Following a bench trial, the trial court ordered that the parents continue to have joint custody, but modified primary physical custody and visitation. Both Father and Mother had sought sole custody, each alleging a change of material circumstances warranting modification of their joint custody arrangements. The Father asserts on this appeal that the trial court erred because he is comparatively more fit than the Mother to have custody, and that the court incorrectly applied the change of circumstances requirement. In the alternative, Father asserts the prior six-month arrangement should be reinstated. We affirm the trial court's order.

## I.

The parties were divorced on July 23, 1993, based on irreconcilable differences. At the time of the divorce the parties had two minor children. In their marital dissolution agreement, incorporated into the decree, the parties agreed to joint custody, with physical custody evenly divided. Mother was to have primary physical custody from February 1 to July 31, and Father the rest of the year. The non-custodial parent had liberal visitation. The parties lived under this arrangement until this action began.

On December 30, 1997, Father filed a petition for change of custody asserting a material change in circumstances warranting change of custody. The petition specifically alleged that Mother had remarried, and that her new husband acted inappropriately around the children. On January 12, 1998, Mother filed an answer and counter-complaint, responding that the conduct of the second husband was moot because they were already divorced. She counterclaimed alleging that Father had remarried and moved into a "dilapidated" house in a "dangerous" neighborhood. She also alleged that Father was an absentee parent due to his work schedule, leaving primary care of the children to the stepmother. Both parties' pleadings included other allegations, which each maintained warranted modification of custody.

Father was due to return the children to Mother on February 1, 1998, and prior to that date, Father requested a hearing on the issue of temporary custody. After a hearing on January 20, 1998, the trial court ordered that custody remain the same but that the children

continue to reside primarily with Father pending the final hearing of the case.

After an evidentiary hearing, conducted on May 15, 1998, the trial court issued an order in which it found that it was in the best interest and welfare of the parties' minor children that they remain in the joint custody of both parents. The court ordered that mother have increased physical custody from August 18 through May 31 of each year. The court's order also addressed the issues of visitation and child support. Father appeals the order of the trial court granting Mother increased primary physical custody of the children.

## II.

Cases involving a request for change of custody of minor children are particularly fact driven. *See Rogero v Pitt*, 759 S.W.2d 109, 112 (Tenn. 1988). In such cases, the trial court has the widest discretion to order a custody arrangement that is in the best interest of the child. *See e.g. Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. App. 1996); Tenn. Code Ann. § 36-6-101(a)(2) (1996). Accordingly, it is well settled that the appellate court's review of a trial court's findings in a custody dispute is *de novo* on the record, accompanied by a presumption of correctness. *See Nichols v. Nichols*, 729 S.W.2d 713, 716 (Tenn. 1990); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984). An appellate court will not reverse such a decision, absent an error of law, unless the appellate court finds that the evidence preponderates against the trial court's findings. Tenn R. App. 13(d); *See Hass*, 676 S.W.2d at 555; *Masengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn. App. 1995).

## III.

A decree awarding custody of children is *res judicata* and is conclusive on a subsequent application to change custody unless circumstances have changed in a material way so that the welfare of the children requires a modification of the previous order. *See Long v. Long*, 488 S.W.2d 729, 731-732 (Tenn. App. 1972); *Hicks v. Hicks*, 26 Tenn. App. 641, 176 S.W.2d 371, 374-375 (1943). Courts are empowered to change custody "as the exigencies of the case may require." Tenn Code Ann. § 36-6-101(a)(1).

"Notwithstanding the importance of stability and continuity, intervening changes in a child's circumstances may require modifying an existing custody and visitation arrangement." *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. App. 1997).

However, a custody order cannot be modified absent a showing of new facts or "changed circumstances" which require an alteration of the existing order. *See Woodard v. Woodard*, 783 S.W.2d 188, 189 (Tenn. App. 1989). There is no hard and fast rule as to what constitutes a change of circumstances. *See Dantzler v. Dantzler*, 665 S.W.2d 385, 387 (Tenn. App. 1983). However, "changed circumstances" includes any material change of circumstances affecting the welfare of the child or children, including events occurring since the initial custody decision or changed conditions which could not have been anticipated by the original custody order. *See Blair v. Badenhope*, 940 S.W.2d 575, 576 (Tenn. App. 1996).

IV.

If the court finds that a material change of circumstances has occurred, then the court will proceed to determine if the best interests of the child dictate a change in the existing custody arrangement and to devise a custody arrangement that serves those interests. *See Adelsperger*, 970 S.W.2d at 485.

"In child custody matters the paramount concern of the Court is the welfare of the children and the rights of the parties will yield to that concern." *Dantzler*, 665 S.W.2d at 387; *see also Contreras v. Ward*, 831 S.W.2d 288, 289 (Tenn. App. 1991). In custody matters, the determining facts are infinite in their variety and "the supreme rule to which all others should yield is the welfare and best interest of the child." *Holloway v. Bradley*, 190 Tenn. 565, 571, 230 S.W.2d 1003, 1006 (1950). In any proceedings requiring the court to make a custody determination regarding a minor child, such determination shall be made upon the basis of the best interest of the minor child. Tenn. Code Ann. § 36-6-106.

In determining the custody arrangement which will serve the best interest of the children, the court will assess the comparative fitness of the parties seeking custody in light of the particular circumstances of the case, considering the relevant factors, which are the same in a modification proceeding as those criteria used in establishing the initial custody order.[1]

---

[1] 36-6-106. Child custody.--In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, such determination shall be made upon the basis of the best interest of the child. The court shall consider all relevant factors including the following where applicable:

(1) The love, affection and emotional ties existing between the parents and child;
(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary care giver;

*See Ruyle v. Ruyle*, 928 S.W.2d 439, 442 (Tenn. App. 1996); *Matter of Parsons*, 914 S.W.2d 889, 893 (Tenn. App. 1995); Garrett, *Tennessee Divorce, Alimony and Child Custody* § 26-5 (1998 ed.).

In *Bah v. Bah*, 668 S.W.2d 663 (Tenn. App. 1983), this court established some guidelines for determining the best interest of a child:

> We adopt what we believe is a common sense approach to custody, one which we will call the doctrine of "comparative fitness." The paramount concern in child custody cases is the welfare and best interest of the child. *Mollish v. Mollish*, 494 S.W.2d 145, 151 (Tenn. App. 1972). There are literally thousands of things that must be taken into consideration in the lives of young children, *Smith v. Smith*, 188 Tenn. 430, 437, 220 S.W.2d 627, 630 (1949), and these factors must be reviewed on a comparative approach:
>
>> Fitness for custodial responsibilities is *largely a comparative matter*. No human being is deemed perfect, hence no human can be deemed a perfectly fit custodian. Necessarily, therefore, the courts must determine which of the two or more available custodians is more or less fit than others. *Edwards v. Edwards*, 501 S.W.2d 283, 290-291 (Tenn. App. 1973)(emphasis supplied).

*Bah*, 668 S.W.2d at 666.

In summary, the party seeking to change custody must show "(1) that the child's circumstances have materially changed in a way that could not have reasonably been foreseen at the time of the original custody decision, and (2) that the child's best interest will be served by changing the existing custody arrangement." *Adelsperger*, 970 S.W.2d at 485. The paramount consideration in a custody proceeding is the best interest of the child or children. *See Bah*, 668 S.W.2d at 665.

V.

---

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; and

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child.

See footnote 9.

At the close of the January 20 hearing, and again at the beginning of the May 15 hearing, the trial court found a substantial and material change of circumstances on the basis that the custodial arrangement which had worked for a while was no longer working and that the parties were no longer cooperative and working together in the best interest of the children[2].

The evidence does not preponderate against the trial court's finding. The record clearly demonstrates that the joint custody arrangement previously in effect had become problematic only recently due to the parties' contentious attempts to control various aspects of their children's school, church, and other activities.[3] The fact that a once satisfactory custody arrangement has become unworkable can constitute a material change of circumstances. *See Dalton v. Dalton*, 858 S.W.2d 324, 326 (Tenn. App. 1993).

The parties were divorced in 1993. In September of 1995, Father married Carolyn Lurie, who had three children from a prior marriage. The Luries had a child in February of 1996, and at the time of the hearing Mrs. Lurie was expecting their second child. Mother married Jimmy Manning, who was 18 years old at the time of the marriage. She divorced Mr. Manning in August or September of 1996. During the marriage, a child was born to the couple. At the time of the hearing, Mother was in a relationship with another man, and the two planned to get married in the future but chose to wait to set a date until they completed pre-marital counseling.

The parties appear to have successfully managed their joint parenting responsibilities under their agreed arrangement of equal primary physical custody for almost five years. Between 1992 and 1997, for various periods of time, the children's paternal grandmother kept

---

[2] To the extent that Father's argument regarding the burden of proving change of circumstances could be interpreted as an argument that the court found the incorrect change of circumstances, Father has waived that argument. At both the end of the January hearing and the beginning of the May hearing, the court announced its finding. In a pleading filed May 2, 1998, Father stated that on January 20, the court had found that there existed a substantial and material change of circumstances in that the co-parenting arrangements were no longer working. Further, at the May hearing the court stated: "So the Court has found a substantial and material change of circumstances. So what we want to do today would be examining the factors that go into what's in the best interest of the minor children, as well as custody, visitation, and support issues. So we're pretty much limited to those issues unless the attorneys identify other issues that we are to hear today. Any other issues other than those?" Both counsel responded negatively.

[3] In a separate argument, while conceding that a change of circumstances was demonstrated, Father submits that he proved the changes of circumstances alleged in his petition, but that Mother failed to prove the changes of circumstances alleged in her counter-petition. He argues, without supporting authority, that this is dispositive of the case based on his contention that only the party proving the existence of a material change of circumstances can prevail in the resulting comparative fitness analysis. Without commenting on Father's characterization of the evidence adduced at trial, we wish to point out that this legal theory is not correct. As stated above, once there is evidence of a material change of circumstances in the record, the trial court must weigh the comparative fitness of the parties, and do what is in the best interest of the children.

the children after school, Father's new wife babysat with Mother's new child, the daughter of the stepmother spent a night at Mother's house, and Mother and her second husband took all of the children, including stepmother's children, on an outing. Even recently, Father had asked Mother if she or her fiancé could accompany the son and his stepbrother to an event. During one spring and summer when Mother had physical custody, she arranged for Father to help coach their son's baseball team while she was the team mother. During the summer of 1997, the stepmother kept the children while Mother taught half days in summer school. The parties operated under an agreement that if one of them was going to be unavailable during their time of custody or visitation, the other had the opportunity to have the children. The children regularly attended church with both parents. Teachers testified that in the past the parents had cooperated in school matters.

After the children returned to their father's household in August, 1997, the cooperative parenting situation deteriorated. The daughter entered first grade and the son entered fourth grade at the same public magnet school that they had been attending. A few weeks after school started in September, 1997, the daughter experienced difficulty in reading. As a result of the teacher's concern, the daughter went to live with Mother for two weeks, and Mother, a teacher, worked with her intensively, resulting in an improvement in the child's reading ability. Father disputes that the improvement was due to Mother's effort. The son also chose to stay with Mother during these two weeks.

At some point in this fall term, the stepmother indicated to the school guidance counselor that she would prefer that the children were in a different school. When the assistant principal asked Mother about any intent to change schools, Mother indicated she was unaware of any such discussions. Mother asked that school officials and teachers not share confidential information about the children with anyone, including the stepmother, other than herself and Father. The assistant principal testified that she considered this request appropriate and that it was consistent with the school's policy.

In late October or early November, the son asked to meet with the counselor. She called Father to ask permission to talk to the son, and Father requested a meeting with her. Father and stepmother met with the counselor and discussed Mother, her premarital relationship with her

second husband and her second marriage, which had ended over a year before this meeting. The counselor described Father as painting a picture questioning the mother's moral character.

In early December, Father requested a meeting with the assistant principal to discuss problems. He and the stepmother met with the assistant principal for approximately 1 ½ hours, during which time he told her about Mother's early life, including things the assistant principal considered demeaning, and about Mother's second marriage to a very young man. At this meeting, on December 7, the father indicated he did not intend to seek full custody since he didn't think it was necessary.

The guidance counselor continued to keep in touch with the children and knew that custody was to change to Mother on February 1. She never saw anything to indicate adjustment problems with the upcoming return to Mother's custody.

Father received a copy of a letter dated December 12 from Mother's attorney to the school explaining that it would be inappropriate for the school to provide the stepmother with access to the children's files or any information regarding the children. Within three or four days of receiving the letter, Father went to his lawyer. However, Father testified that the letter did not upset him. He further stated that it was not entirely true that he decided to seek custody because of the letter, stating that, upon receipt of the letter, he had discussed the issue with his 9-year old son who asked him to seek custody.

A dispute arose about the children's visitation with the mother over Christmas and the school holidays. Father again received a letter from the mother's attorney. Upon advice of his own lawyer, Father allowed the children to visit their mother in accordance with the parties' past practice and agreement. A dispute also arose over the children's participation in Christmas programs at both Mother's church and Father's church.

On December 30, 1997, Father filed a petition to modify custody asking the court to award him sole custody. Mother answered and counter complained seeking sole custody.

At the January 20 hearing on Father's temporary custody petition, the teachers and school officials who testified indicated the children had been doing well. They reported, however, some changes in behavior by both children after the Christmas break. Both children's teachers attributed the changes in behavior to things going on outside school. The daughter became

more tearful and upset. A few days before the hearing, the assistant principal saw the daughter in the school office. She was crying and upset, and her finger was hurt. While the assistant principal was trying to comfort and calm her, the 6-year old daughter, still crying, said, "my daddy said I was supposed to tell you that I want to live with my daddy."

Other disputes arose during the late fall of 1997, which need not be catalogued here. As an example, at one point Father instructed his children and stepchildren not to talk to Mother, at least not about anything that went on in his home. The testimony in the record clearly establishes the deterioration and eventual dysfunction of the prior custody arrangement and its negative effect on the children. After the lengthy hearing, the trial court ordered that the parties continue to have joint custody, with possession to remain with the father with previously-ordered visitation with the mother, pending a final hearing.[4]

## VI.

At the January 20 hearing, Father testified that an appointment with a psychologist had been arranged for the parties' daughter. The appointment, which was arranged approximately three weeks before the January 20 hearing, after Father's petition was filed, was set for February 4.

At the close of that hearing, the court gave very explicit instructions:

> The court orders Mr. Lurie to keep the appointment of [daughter] with Dr. Shannon Little. Both parents are to participate as Dr. Little directs, and the records of Dr. Little will be available to both parents.

However, Father did not take his daughter to the February 4 appointment with Dr. Little.[5]

---

[4] The written order entered January 29 states that the father is awarded temporary custody. However, the court's comments from the bench at the close of the hearing are consistent with the court's May 7 clarification of that January 29 order wherein the court set aside that portion of the earlier order which awarded temporary custody to the father. The court stated it had never awarded temporary custody, but merely extended the current situation pending consideration of all factors.

[5] Father testified that after the January hearing he had called Dr. Little's office about their procedure and was informed that Dr. Little would meet with both parents at the same time. Father was concerned that Mother would be uncomfortable meeting with him, and asked, without consulting Mother, if it was possible to meet individually with the parents. He testified the psychologist's office called back and canceled the appointment. After the final hearing, the court made a specific finding that Father's reasons for not keeping the appointment as ordered were not credible. The court found that Father brought up the appointment in his January testimony, stating his concern was for the welfare of the child. The court found that Father had a desire to be controlling so he did not take the child to the psychologist as ordered. The court specifically found that Father's telephone call to the psychologist's office caused the cancellation of the appointment.

Both the daughter and son were seen later by another clinical psychologist, Dr. Sanger, who testified at the May 15 hearing. She was originally contacted to evaluate the daughter, and had her first session with the daughter in March.

Dr. Sanger stated that the daughter had a very positive attachment to her mother, her father, and her stepmother. She also felt positively toward Mother's second husband. The daughter presented herself as happy and well integrated into her family situation, although there were stresses around the custody dispute, the daughter was aware of the tensions, and was concerned about having to answer questions about the situation.

Dr. Sanger also saw the son and reported that he also had a positive attachment to his father, his mother, and his stepmother and that these were important relationships to him. She stated that the son identified with Father. She indicated the son was guarded and careful with his words on the topic of the custody dispute but did not acknowledge any anxiety about that situation or the court proceedings.

Dr. Sanger testified that she thinks it detrimental for children to hear negative things about their parents. She had told the parents, when asked about the son testifying, that in general she had reservations about children being put in a situation where they have to state a preference for one parent versus the other, and that there are risks to the children in such situations. She also stated it was important that parents be careful about what information they share (regarding the issues in the custody dispute) with a child and that such information should be developmentally appropriate. She would, in general, question the appropriateness of going through actual pleadings or reviewing recorded conversations with a 9-year old. However, she felt that giving a mature child an appropriate forum to express his strongly-held feelings might be appropriate in some situations.

In general, Dr. Sanger found both children to be happy and well-adjusted with positive attachments to both parents.

VII.

After the January hearing, cooperation deteriorated even further. There were disputes over clothing, dental visits, telephone call from Mother to the children, chaperoning field trips and other issues. A dispute about visitation over spring break resulted in further hearings

-10-

before the court.

In late January, Father began taping telephone conversations between Mother and himself and between Mother and the children.[6] The children were aware of the tape recorder, and the son would sometimes turn it on himself. Father or stepmother would turn the recorder on for the daughter's conversations. Father could not recall whether he had told his children not to inform their mother that her conversations were being taped, but he thought his son was well aware that if he mentioned the recording Mother might alter what she was saying.

The parties did not agree on many things in their testimony, each having his or her own interpretation of events. However, their testimony and that of others establish that during the period from 1992-1997, Mother made an effort to have daily contact with the children during those periods when Father had primary custody. She would visit with the children after school or eat lunch with one of them. She was a frequent visitor to the school and attended school events. If she was unable to make personal contact during a day, she telephoned the children in the evening. On the other hand, Father seldom telephoned the children during those times Mother had primary custody. He stated he did not telephone the children at Mother's house because, out of respect, he wanted to give her her ground with the children. He felt he deserved the same respect. He also stated the children could call him if they needed something.

It is also generally agreed that Mother was responsible for arranging and taking the children to medical and dental appointments, up until January 1998. Mother also testified that for several years she had attended most practices and every recital for her daughter's dance classes. She had similarly attended her son's sporting events.

She testified, however, that after the January 20 hearing, she was not informed by Father of upcoming events or activities in her children's lives. Father started communicating information to her by certified mail. In one situation, he mailed her notice of a cancellation on the same day of the meeting. Father and stepmother instituted a practice of unplugging their telephone in the evenings so that their family dinner time and Bible study would not be interrupted. This resulted in Mother being unable, on some occasions, to talk to her children,

---

[6] He testified that the taping of the children's conversations resulted from his misunderstanding of his attorney's instructions. Father stopped taping the conversations between Mother and children after being so instructed by his lawyer, and no recorded conversations were admitted into evidence.

thereby preventing her from maintaining her practice of daily contact with the children. Father considered Mother's telephone calls to the children disruptive and maintained they sometimes upset the children.

The parties' 9-year old son testified at both hearings. At the first hearing, he was asked who asked him to testify. He stated, "I was kind of the main deal so I sort of had to be here. Because one of the main reasons to be here, we were thinking that we had to have at least one of the children that would be able to testify." The son also stated he had been given the letters involved in this litigation by his father "to see if I think they are ridiculous, because he thinks they were." The son was given Father's petition and Mother's counter-petition to review by Father. As to his review of his mother's pleading, the son testified that he and his father went over the document and that Father needed to get evidence to contradict statements in the counter-petition.

The son testified that he has a good relationship with both his father and his mother, with his stepmother, and with his step siblings and his half brothers. He loves both his parents and his stepmother and likes his mother's fiancé and his child. He enjoys being at his mother's house and enjoys being at his father's house. He stated his preference was to live at his father's house.

The son also stated that he had turned on the tape recorder when he talked to his mother because he thought some of the conversations she had with the children were inappropriate and needed to be presented to the court. He was unable to remember any specific conversation he thought was inappropriate. He also stated that he listened to the taped conversations with his mother a few times because he happened to be in the room with his father and stepmother while they were playing the tapes. Father did not remember the son ever listening to any tapes at home. When the son would return from visits with Mother, he would tell Father and the stepmother about events that happened, and the stepmother would take notes. The son stated he told her what to write down.

## VIII.

After hearing all the testimony in this matter, the trial court made extensive findings. The court observed that during the time Mother was married to her second husband, "she was not

-12-

making decisions which were in the best interests of her children." The court found that since Mother had divorced the second husband (a year and a half earlier), any future dealings between those two would not adversely affect the minor children.[7]

The trial court found that the problems with the joint custody arrangement had arisen only when Father became critical of Mother's decision-making concerning her second husband and when Mother became jealous of the relationship between the children and the stepmother. He further found that Father had involved the parties' son in the dispute between the parties, including this litigation, and had gone to the children's school and related his version of Mother's past behavior with the young man who became her second husband. The court also specifically found that both parties have strong personalities, which he characterized as controlling and manipulative, and that neither was a credible witness.

In essence, the court refused to grant to either party the custody modification he or she requested, i.e., sole custody. The trial court specifically found that it was in the best interest of the minor children that they remain in the joint custody of the parents and that the parents make joint decisions regarding major medical problems of the children. However, he found it was not in the best interest of the children that the children continue to reside with each parent for six months.

We are of the opinion that the evidence does not preponderate against the trial court's finding that the best interest of the children would be served by continuing joint legal custody but modifying the primary physical custody arrangement from a half-year basis to a school-year basis with liberal visitation accorded each parent. *See, e.g., Rubin v. Kirshner*, 948 S.W.2d 742 (Tenn. App. 1997); *Barnhill v. Barnhill*, 826 S.W.2d 443 (Tenn. App. 1991). In structuring the arrangement herein, the trial court gave thorough and detailed directions to the parties in an effort to avoid the type of control issues which had previously occurred. In view of the stressful situation which developed in the fall of 1997 regarding school issues and which escalated to all issues to the extent the children's behavior changed, we agree it is in the best interest of the children to remain in one parent's primary physical custody for the school year.

---

[7] At the close of the January hearing, the court stated it did not give a great deal of weight to the testimony concerning actions of the mother's second husband because those things happened in the past and the father had not come forward at that time and alleged a change of circumstances.

In this case, the trial court was faced with conflicting evidence concerning the fitness of Father and Mother as parents. As stated above, both sides made efforts to disparage the character and fitness of the other, cataloguing the missteps of the other and the virtues of their own situations. They criticized each other's residences, specific isolated examples of punishment each thought inappropriate, and other matters. No one's interests, particularly those of the minor children, would be served by our detailing those claims herein. The trial court's order reflects careful consideration of the parties' evidence. Ultimately, the court concluded that "weighing the many factors for consideration of custody, the court finds that it is in the best interest of the minor children that they be in the joint custody of the parents with the primary custodian being Michelle Lurie Manning from the 18th day of August to the 31 day of May each year and the father being the primary physical custodian from the 1st of June to the 17th day of August each year." In ruling on various post-trial motions, the court denied Father's Tenn. R. Civ. P. 59 motion, stating it had given a great deal of emphasis in its final decision to the best interest of the children and had looked at many factors in making that determination, and was still of the opinion that its earlier order was in the best interest of the children.

As set out earlier, our review of the trial court's decision is subject to well-established rules. In the recent case of *Adelsperger v. Adelsperger*, 970 S.W.2d 482 (Tenn. App. 1997), this court stated the standard as follows:

> Custody decisions are factually driven and require the careful consideration of numerous factors. *See Holloway v. Bradley*, 190 Tenn. 565, 571, 230 S.W.2d 1003, 1006 (1950); *Scarbrough v. Scarbrough*, 752 S.W.2d 94, 96 (Tenn. App.1988). Since these decisions often hinge on the parties' credibility, appellate courts are reluctant to second-guess trial judges who have observed the witnesses and assessed their credibility. *See Gilliam v. Gilliam*, 776 S.W.2d 81, 84 (Tenn. App.1988). Accordingly, we decline to disturb custody decisions unless they are based on a material error of law or the evidence preponderates against them. *See Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn.1984); *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. App.1996); *Griffin v. Stone*, 834 S.W.2d at 301.

970 S.W.2d. at 485.

It is with this standard in mind that we review Father's arguments on appeal, which essentially argue that the evidence preponderates against the trial court's decision. At

-14-

the hearings in this matter, Father explained that his goal in seeking custody was continuity for the children. He felt that Mother's second marriage, which resulted in divorce, as well as her new relationship, did not provide stability in the children's environment. It was his opinion that Mother and her fiancé, by delaying their marriage, were failing to provide the children a family unit such as he and his wife could provide. The record substantiates the stability of Mother's relationship with her children and her efforts to maintain it. There is nothing in the record to indicate that the children were negatively affected by her changes in marital status.

In this appeal, Father also asserts that he should have been awarded custody because he is of higher moral character than Mother based on her relationship with the teenager she later married. Father was aware of that relationship from late 1992 or early 1993. We certainly do not condone Mother's relationship with a minor. However, for over four years, Father was not so concerned about Mother's moral character that he sought custody. In addition, the best interest analysis requires consideration of many factors which may affect a child's well-being.

Father also argues that he was concerned about the conduct of Mother's second husband around the children. Father admitted he knew about the conduct he now objects to, with one exception, almost immediately after each event, and, again, did not deem it significant enough to warrant his seeking custody. In fact, the evidence demonstrates a cordial relationship between the two families during Mother's second marriage. At the time that Father filed his petition, Mother had been divorced from her second husband for fifteen to sixteen months. We agree with the trial court that any future dealings between Mother and her second husband regarding their child would not adversely affect the children.

From the record, it appears that Father's petition for sole custody was triggered by the contentious situation which had developed as a result of his spreading derogatory information about Mother to school officials and Mother's request that information about the children not be shared by school officials with the stepmother. Mother had also expressed to Father her strong feelings that Father, rather than the stepmother, should be making parental decisions and dealing with the school. Father equally strongly resented what he characterized as Mother's attempts to dictate in an area he considered his family business.

It is also apparent from the record that once battle was joined, the children's best interest became secondary. Father's involvement of his 9-year old son in the details of the litigation,

-15-

to the point of going over the pleadings, discussing strategy about evidence, and having the son tape his conversations with his mother, did not serve that child's best interests. Those actions clearly did not encourage the children to love and respect each parent equally. *See Varley v. Varley*, 934 S.W.2d 659, 667-668 (Tenn. App. 1996). Nor did they further preservation of the children's relationship with both parents.[8] *See Wright v. Stovall*, No. 01A01-9701, 1997 WL 607508 at *7 (Tenn. App. 1997).

These parents were able to exercise their co-parenting responsibilities harmoniously for a long time, with beneficial results to their children. They are to be commended for their successful, if not always easy, efforts. Their later inability to deal with each other or with issues related to the children created the situation which let to this litigation. In turn, the litigation itself increased the level of contentiousness, all with a detrimental effect on the children. In determining how to best reduce those detrimental effects, the trial court considered many factors, including ways to reduce the opportunity for confrontations and disputes between the parents. The trial court's order herein does that and is carefully structured to further the best interest of the children.

XI.

Bearing in mind the mandate of a comparative fitness test, and having reviewed the entire voluminous record in this case, we have reached the conclusion that the evidence does not preponderate against the finding by the trial court that continued joint custody with increased physical custody to Mother is in the best interest of the children. The trial court considered carefully all the relevant factors and the testimony of the witnesses, gave their testimony the weight and credit that the court felt the testimony deserved, and fashioned a detailed custody arrangement to further serve the children's interests.

---

[8] Effective May 18, 1997, another factor was added to the list of those to be considered by the court in determining a custody award. *See* 1998 Tenn. Pub. Acts, ch. 1003. That provision, now codified at Tenn. Code Ann. §36-6-106(10), requires the court to consider "each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child." The policy enunciated in that statutory amendment had already been adopted in case law.

For the reasons stated above the order of the trial court is affirmed, and the case is remanded to the trial court for whatever further proceedings may be necessary.  The costs of this appeal are taxed to the Appellant.

-17-

_____
PATRICIA J. COTTRELL, JUDGE

CONCUR:


_____
BEN H. CANTRELL, PRESIDING
JUDGE, M. S.


_____
WILLIAM C. KOCH, JR., JUDGE