# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

## JOHN DERRICK TERRY v. MICHELLE AMANDA TERRY

**Direct Appeal from the Chancery Court of Williamson County**
**No. II-25334   Russ Heldman, Judge**

---

**No. M1999-01630-COA-R3-CV - Decided June 29, 2000**

---

The trial court, finding fault on the part of both parties, declared them divorced. The court awarded custody of the children to the mother, with reasonable visitation to the father.  The court set child support; awarded rehabilitative alimony and attorney fees to the mother; and divided the property, awarding the mother the marital home.  The father appeals the custody, alimony, marital home and attorney fees awards.  We affirm the trial court's decree as to these issues, but vacate two injunctions as overly broad.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part, Vacated in Part, and Remanded**

COTTRELL, J., delivered the opinion of the court, in which CANTRELL, P.J., M.S., and KOCH, J., joined.

E. Covington Johnston, Jr., Franklin, Tennessee, for the appellant, John Derrick Terry.

No appearance for the appellee, Michelle Amanda Terry.

## OPINION

This case involves various orders associated with the dissolution of a marriage of relatively short duration.  The trial court awarded custody of the children to Michelle Amanda Terry ("Mother") and set child support. John Derrick Terry ("Father") was ordered to pay rehabilitative alimony of $750 per month for sixty months, and to pay $8,000 of Mother's attorney fees. The court awarded the marital home to Mother, along with the obligation to pay the corresponding debt, and made other rulings regarding the distribution of property and debts.  Father appeals the awards of custody of the children, alimony, attorney fees, and the marital home.  For the following reasons, we affirm those awards.

The parties married in 1994.  It was Mother's first marriage and Father's second.  The parties

had two children, a boy, born in 1995 and a girl, born in 1997. Mother had a daughter from a previous relationship who lived with the parties throughout the marriage. Father filed for divorce in March 1998. He obtained a court award of temporary custody of the children in April 1998, and again in November 1998. The parties attempted to reconcile twice, once in June through September, and again in November. A few days after obtaining temporary emergency custody in November, Father reconciled with Mother. Mother testified that he "gave" the children back to her.

Father worked as a Lexus salesman and earned only commissions. His income for the year prior to the hearing was $79,200 and he had earned $18,000 in the three months immediately preceding the hearing. He said he worked about fifty hours per week, and maintained insurance on the family. Father denied having problems with money, but did admit that he was in his second Chapter 13 bankruptcy[1] and that his car had been repossessed. He testified he was paying $2,200 per month to the trustee to pay his debts, which, he said, included the mortgage payments. At the time of the hearing, he was living rent-free in a guest house belonging to some friends.

Mother was not employed outside the home for most of the marriage, but got her realtor's license about six months before the hearing. She testified she had been working five days a week, but her hours varied. Mother had not completed any house sales at the time of the hearing, but said she had sold a house that needed some minor repairs before it closed, and she expected to receive $7,200 as her commission. She said she received $800 per month from the father of her oldest child and wanted $2,300 from Father in child support and alimony until her real estate work became successful. Mother said she had few debts, only the mortgage and one credit card. She said she never filed a joint tax return with Father "because he owed so much."

Testimony indicated the marital home was valued at $145,000, but more than $144,000 was owed on it. Mother said she could take over the payments if Father would pay the past due amount.

Father denied having a problem with his temper, but did admit to two convictions for violence toward Mother. He had been ordered to have counseling after each conviction. Charges stemming from his third arrest were dropped. He said the police had been called to the parties' home on three or four occasions. Mother testified there was more violence in the marriage than indicated by Father's three arrests; her injuries included a ruptured eardrum, bruises, scratches, and a split lip. She claimed Father had strangled her once.

Mother said that after their separation Father had installed a video camera in the house and had placed a wiretap on her telephone. Father denied telling her that the telephone was tapped, although at an earlier hearing he had admitted placing a wiretap on the phone. Mother testified that Father had followed her after the separation, and that he had a neighbor watching her. The neighbor testified that she did watch Mother at Father's request.

---

[1]His initial bankruptcy petition was filed at the time of his first divorce.

Father admitted that he had been ordered earlier to pay the mortgage, but was six months behind in his payments. He admitted that he had been ordered to pay the utilities, but some had been disconnected because of non-payment. He claimed he had not paid the bills because Mother never furnished the bills to him, although Mother testified that some of the disconnections occurred after the bills were mailed directly to Father. He admitted to stopping payment on a check to the Mother's Day Out program and refusing to pay for the children's new daycare because he was ordered to pay "household expenses" and he did not consider daycare a household expense.

The parties spent $800 per month for groceries before their separation. Since the separation, Father said he had given Mother $250 per month.[2] He said he "can't just give her money," but said he had offered to shop for her. Father denied keeping the checking account in his name only, but admitted "taking her off" his account after she bounced some checks. Mother said Father gave her small amounts of cash at a time, but that she had to go to his workplace to get it. He required her to sign receipts for the money. Mother said Father followed her to the gas station and paid for the gas himself rather than giving her the money.

Father claimed that Mother abused alcohol and prescription drugs, and did not provide proper care for the children. Mother denied abusing prescription drugs. The evidence showed that she had prescriptions under both her married name and her maiden name, but that no prescriptions were duplicated. The same doctor wrote all of her prescriptions. Mother explained that she had used her married name for those prescriptions paid by Father's insurance company and her maiden name for those prescriptions paid by another insurer. Her pharmacist, a witness introduced by Father, testified that he saw nothing irregular about Mother's prescriptions. Mother admitted that she sometimes drank too much, but denied that she was an alcoholic. Mother's mother, Ms. Chambers, had had Mother arrested the previous summer. Mother was subsequently admitted to a psychiatric hospital for a short period. Ms. Chambers said that Mother was "drinking to bury the pain."

Conflicting testimony about Mother's care of the children was introduced. Father and his witnesses testified to instances in which Mother did not provide what they considered appropriate care for the children. Mother produced witnesses who testified that she did provide good care for the children. For example, one of Father's witnesses, a daycare worker at a drop-in site, testified that Mother took the children to the center one February night without shoes, socks, coats or diapers. Mother was late to pick the children up that night because of car trouble, and a friend took her to get the children. The friend testified that the children were dressed, and had their coats and shoes on. He said he was a father and would have addressed the issue with Mother if the children had been inappropriately dressed.

Father produced a witness who testified that Mother's house was cluttered with toys and clothing, and had dirty dishes in the sink. Mother's mother described the house as containing "normal clutter." Mother admitted to having owned a puppy which was not housebroken. The dog became too much trouble for Mother and she gave it away before the hearing. One of Mother's

---

[2]Father wrote checks in set amounts to the grocery store and gave the checks to Mother.

witnesses, who attended a Christmas party at her home, described the house as "clean and beautiful."

The parties differed in their testimony about which of them was the primary caregiver. Mother claimed she usually took the children to the doctor and did the cooking, grocery shopping, housecleaning, and shopping for clothes. Father claimed to have been the primary caregiver when he was at home. He said he cleaned the house and cared for the children. Mother claimed that father "worked all the time," and went straight to bed when he got home.

Mother said that since the separation, Father has "used the children" against her. She claimed that he had not picked up the children when he should, requiring her to find a babysitter. She said he had sometimes refused to return the children, and on five different occasions, he had told her she would have to call the police to get them back.

After hearing the evidence, the court declared the parties divorced pursuant to § 36-4-129(b). The property was divided, and Mother was awarded the house. Mother was awarded a judgment for the arrearage in the mortgage payments, which Father had been obligated to pay in an Agreed Order entered *pendente lite.* Mother was to assume the house payments, and Father was relieved of any future obligation on the mortgage. Mother was awarded rehabilitative alimony of $750 per month for five years, and was awarded attorney fees of $8,000.

Regarding custody, the court stated that Father's claims against Mother were clearly exaggerated, making reference to the fact that Father had twice been awarded custody of the children, only to later relinquish it. The court stated that custody was a close call, but, relying on Tenn. Code Ann. § 36-6-106(10), the court believed that Mother was much more willing than Father to encourage a close relationship between the children and the other parent.

The court said it was concerned about Mother's possible abuse of the prescription drugs, but had been provided no medical evidence of abuse. The court noted that Father could seek a change of custody if such evidence could be produced.

## I. Standard of Review

We review the findings of fact by the trial court *de novo* upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d). Because the trial judge is in a better position to weigh and evaluate the credibility of the witnesses, we give great weight to the trial judge's findings on issues involving their credibility. *See Gillock v. Board of Prof'l Responsibility*, 656 S.W.2d 365, 367 (Tenn. 1983).

## II. Custody of the Children

Our courts make no more important decisions than those involving the custody of children. When called upon to order a custody arrangement, a court must consider many factors and make a custody determination based on the best interest of the children. *See* Tenn. Code Ann. § 36-6-106 (Supp. 1999) (listing the factors for the court to consider).

In child custody cases, the welfare and best interest of the children are the paramount concern, and the determination of the children's best interest must turn on the particular facts of each case. *See Akins v. Akins*, 805 S.W.2d 377, 378 (Tenn. Ct. App. 1990) (citing *Holloway v. Bradley*, 190 Tenn. 565, 570-72, 230 S.W.2d 1003, 1006 (1950)). In *Holloway*, the Court stated:

> The determining facts in these adoption and custody cases are so infinite in their variety that the reported decision in one case is of little aid or assistance in settling the next. The supreme rule to which all others should yield is the welfare and best interest of the child.

*Holloway*, 190 Tenn. at 571, 230 S.W.2d at 1006.

Where, as here, both parents seek custody, this court has held that the child's best interest is to be determined by using an analysis of the comparative fitness of each parent. *See Bah v. Bah*, 668 S.W.2d 663, 665-66 (Tenn. Ct. App. 1983).

> We adopt what we believe is a common sense approach to custody, one which we will call the doctrine of "comparative fitness." The paramount concern in child custody cases is the welfare and best interest of the child. *Mollish v. Mollish*, 494 S.W.2d 145, 151 (Tenn. App. 1972). There are literally thousands of things that must be taken into consideration in the lives of young children, *Smith v. Smith*, 188 Tenn. 430, 437, 220 S.W.2d 627, 630 (1949), and these factors must be reviewed on a comparative approach:
>
> > Fitness for custodial responsibilities is ***largely a comparative matter***. No human being is deemed perfect, hence no human can be deemed a perfectly fit custodian. Necessarily, therefore, the courts must determine which of two or more available custodians is more or less fit than others. *Edwards v. Edwards*, 501 S.W.2d 283, 290-291 (Tenn. App. 1973) (emphasis supplied).

*Id.*, 668 S.W.2d at 666.

Because the determination of where a child's best interest lies is the result of the consideration of a number of factors in the context of a specific factual situation, *see Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997), it is particularly fact-driven. *See*

*Rogero v. Pitt*, 759 S.W.2d 109, 112 (Tenn. 1988). Such decisions often hinge on the trial court's assessment of the demeanor and credibility of the parents and other witnesses. *See Adelsperger*, 970 S.W.2d at 485. Consequently, appellate courts are reluctant to second-guess a trial court's determination regarding custody and visitation. *See Rutherford v. Rutherford*, 971 S.W.2d 955, 956 (Tenn. Ct. App. 1997) (quoting *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996)). Accordingly, this court will decline to disturb the custody decision of the trial court herein unless that decision is based on a material error of law or the evidence preponderates against it. *See Adelsperger*, 970 S.W.2d at 485.

The trial court awarded custody of the children to Mother, referring to its decision as a "close call." The court based its decision, in part, on Father's lack of credibility regarding his allegations that Mother was unfit, finding his claims to be exaggerated. The trial court noted that Father had obtained an emergency temporary custody order in November 1998, only to reconcile with Mother within a few days and leave the children in her care. The court believed that had Father been as concerned as he claimed about the children's safety, he would not have returned them to Mother's care.

The trial court is in a better position to weigh and evaluate the credibility of the witnesses, therefore we give great weight to the trial court's findings on issues involving the credibility of those witnesses. *See Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996). We cannot say the court erred in its assessment of Father's claims. In addition to Father's exaggeration of his fears for the children, we note that he denied having problems with his temper and with handling money, although the evidence showed otherwise.

The trial court also based its decision on Tenn. Code Ann. § 36-6-106(10). That particular section of the statutes is among the factors the court must consider in determining the best interest of the child when making a custody determination. It states:

> The court shall consider . . . (10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child.

Considering Father's actions toward Mother during the marriage and the pendency of the divorce; wiretapping Mother's telephone, asking a neighbor to watch her for him, forcing her to go to him for small amounts of money and sign receipts for it; we cannot say that the trial court erred in its finding that Mother was the more likely of the two to "encourage a close and continuing relationship between the child[ren] and the other parent." *See* Tenn. Code Ann. § 36-6-106(10). We find no error in the award of custody of the children to Mother.

III. The Alimony Awards

Tennessee law provides for three types of alimony: (1) rehabilitative alimony, which provides modifiable, temporary support for a period of adjustment sufficient to enable a dependent spouse to become partially or totally self-sufficient; (2) periodic alimony or alimony *in futuro*, a continuing, but modifiable, support obligation to an economically disadvantaged spouse; and (3) alimony *in solido*, an unmodifiable lump sum award which may be payable over time. *See* Tenn. Code Ann. § 36-5-101(d) (Supp. 1999); *see also Loria v. Loria*, 952 S.W.2d 836, 838 (Tenn. Ct. App. 1997).

Our General Assembly stated its intent "that a spouse who is economically disadvantaged, relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance." Tenn. Code Ann. § 36-5-101(d)(1). Only if "there is such relative economic disadvantage and rehabilitation is not feasible" may the court grant long-term alimony. *Id.* In reviewing the propriety of an alimony award, we must consider a number of factors,[3] including the relative earning capacity, obligations, needs and

_____

[3]Tenn. Code Ann. § 36-5-101(d) directs the trial court to consider all relevant factors, including:

(A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(C) The duration of the marriage;

(D) The age and mental condition of each party;

(E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

(G) The separate assets of each party, both real and personal, tangible and intangible;

(H) The provisions made with regard to the marital property as defined in § 36-4-121;

(I) The standard of living of the parties established during the marriage;

(J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

7

financial resources of the parties.  *See* Tenn. Code Ann. § 36-5-101(d)(1)(A)-(L).  The predominant factors to consider, however, are the receiving spouse's need and the obligor spouse's ability to pay.  *See Hazard v. Hazard*, 833 S.W.2d 911, 917 (Tenn. Ct. App. 1991).  Because support decisions are factually driven and involve considering and balancing numerous factors, appellate courts give wide latitude to the trial court's discretion.  *See Cranford v. Cranford*, 772 S.W.2d 48, 50 (Tenn. Ct. App. 1989).

## A.  Rehabilitative Alimony

Father appeals the award of rehabilitative alimony of $750 per month for five years, claiming that, considering the short duration of the marriage and Mother's current employment, the award is excessive.

The proof at trial showed that Father earned $79,200 the year prior to the hearing, while Mother earned no income.  One of Mother's witnesses described her as "destitute."  Mother obtained a real estate license shortly before the hearing and had hopes of earning a high income, but at the time of the hearing, she had not completed any sales.  The trial court stated, "Clearly, Mr. Terry is better able to earn wages in this relationship.  I am impressed that Mrs. Terry is optimistic about her future, I'm not sure I'm as optimistic as she is . . ."  Mother's only income was child support of $800 per month for her oldest child.  After the court awarded custody to Mother, it awarded child support of $1,200 per month for the parties' two children. Mother estimated her monthly expenses, for herself and the three children, to be $3,189, thus, even with the $750 per month award, Mother cannot meet her estimated expenses until she begins to earn her own income.  These figures leave no doubt that Mother met the economic inequality requirement on which any alimony award must be predicated and clearly establish her need for support while she attempts to become self-sufficient.  *See* Tenn. Code Ann. § 36-5-101(d)(1).  Further, with an income of $79,200, Father clearly has the ability to pay the alimony ordered.  The trial court based its award on the parties' financial situation at the time of the divorce, and we find no error in the award.

## B.  Alimony *in Solido* (Attorney Fees)

In the context of a divorce proceeding, attorney fee awards are considered as alimony *in solido*. *See Goodman v. Goodman*, 8 S.W.3d 289, 297 (Tenn. Ct. App. 1999); *Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996). A trial court is to consider the same factors in making an award of attorney fees as in making other alimony awards.  *See Umstot v. Umstot*, 968 S.W.2d 819, 824 (Tenn. Ct. App. 1997).  The award of attorney fees lies within the sound discretion of the trial court, and unless we find that the evidence preponderates against such an award, we will not disturb it on appeal.  *See id.*

---

(K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so;  and

(L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Father argues that the trial court abused its discretion in awarding Mother $8,000 in attorney fees. He claims that such an award is excessive because of his other obligations. Upon consideration of the relative financial position of the two parties, including but not limited to the ability of each party to pay their own attorney fees, we are of the opinion that the evidence does not preponderate against this award. We affirm the award of attorney fees to Mother.

## IV. The Marital Residence

The trial court awarded the marital residence to Mother, along with its corresponding debt, and ordered that she should hold Father harmless on all future payments. Both parties testified that the home was worth approximately $145,000, and that it had little or no equity. By earlier agreed order, Father was to have made the house payments pending final court action, but he had not done so. At the hearing, Father was six months behind in the payments, owing almost $9,000. The court ordered Father to pay the past due amount to prevent Mother from losing possession of the residence.

Father appeals the award of the marital residence to Mother, claiming that Mother cannot afford the mortgage payments, which will result in eventual foreclosure. He further claims that Mother did not contribute to the acquisition of the property, and in fact caused the property to decrease in value by her poor housekeeping.[4] He contends that he was responsible for the reduction of the debt on the property and was making the payments through his Chapter 13 bankruptcy plan. We note, however, that the house had little or no equity and that Father had been ordered to make the mortgage payments, but had allowed the payments to fall seriously into arrears.

The trial court has wide discretion in the award of marital property. *See Smith v. Smith*, 984 S.W.2d 606, 609 (Tenn. Ct. App. 1997). Our legislature requires the court to "give special consideration to a spouse having physical custody of a child or children of the marriage" when awarding the family home. Tenn. Code Ann. § 36-4-121(d) (1996). We find no error in the trial court's award of the marital residence to Mother.

---

[4]Father produced no evidence at trial that Mother's housekeeping had any effect on the value of the residence.

9

V. The Injunctions

In addition to the above rulings, the trial court issued two injunctions which we must address. The court ordered that Mother "shall be and is hereby permanently restrained from owning any animals or pets of any sort," and that Mother "is hereby enjoined from relocating her residence and the residence of the children outside Williamson County, Tennessee, without prior court approval."

Mother made no appearance before this court, either *pro se* or through counsel, and did not raise the propriety of either injunction. Appellate courts have considerable discretion, however, "to consider issues not presented for review in order to achieve fairness and justice." *Aaron v. Aaron*, 909 S.W.2d 408, 412 (Tenn. 1995) (in Order on Petition to Rehear); *see also* Tenn. R. App. P. 13(b).[5]

The court issued the first injunction, permanently preventing Mother from "owning any animals or pets of any sort," stating, "It's too much. . . . I'm not going to make it an issue at her house any more." That injunction was issued after the court heard testimony that for a few months Mother had owned a puppy that was not housetrained, and that she left it indoors for long periods of time. Not surprisingly, dog feces was seen inside the house on occasion. Prior to the trial, Mother had decided that the puppy was indeed "too much" and had given it away. The basis for the injunction, apparently, was the trial court's understandable desire that the children live in a sanitary, healthful environment. The injunction, however, is much broader than necessary to achieve that purpose. As written, this injunction prohibits Mother from owning a goldfish, even after she becomes a senior citizen. We dissolve the injunction prohibiting Mother from ever owning any animals or pets of any sort.

The second injunction, prohibiting Mother from "relocating her residence and the residence of the children outside Williamson County, Tennessee, without prior court approval," is similarly too broad. We assume that the interest prompting this injunction was protection of the non-custodial parent's visitation rights. Our statutes already provide such protection for a non-custodial parent, thereby making such an injunction unnecessary. *See* Tenn. Code Ann. § 36-6-108 (Supp. 1999) (governing parental relocation outside the state or more than one hundred miles from the other parent within the state). The parental relocation statute governs the situation which the trial court sought to address and provides what the legislature considers adequate protection to the non-custodial parent in the event of the custodial parent's relocation. In view of the statute, and the lack of any evidence that Mother intended to remove the children from the area,[6] we dissolve the injunction prohibiting

_____

[5] Tenn. R. App. P. 13(b) says the appellate court "may in its discretion consider other issues in order, among other reasons; (1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process."

[6] Mother's mother lives in the area, although in an adjoining county. At the time of the trial, Father was living in an adjoining county. As this situation makes clear, county boundaries

Mother from relocating her residence and the residence of the children outside Williamson County.

## VI.  Conclusion

For the reasons stated above, we affirm the awards of child custody, alimony, attorney fees and the marital residence to Mother, and vacate the injunctions on Mother's pet ownership and relocation. This case is remanded for such further proceedings as may be necessary. Costs are taxed to appellant.

---

are not necessarily related to the ability of the non-custodial parent to exercise visitation effectively.